UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BEEF PRODUCTS, INC.,<br>BPI TECHNOLOGY, INC. and<br>FREEZING MACHINES, INC.,<br><br>   Plaintiffs,<br><br>   v.<br><br>AMERICAN BROADCASTING<br>COMPANIES, INC., ABC NEWS, INC.,<br>DIANE SAWYER, JIM AVILA, DAVID<br>KERLEY, GERALD ZIRNSTEIN, CARL<br>CUSTER, and KIT FOSHEE,<br><br>   Defendants. | Civ. No. 12-4183<br><br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM IN SUPPORT OF
ABC DEFENDANTS' MOTION TO DISMISS
ALL CLAIMS OF PLAINTIFF BEEF PRODUCTS, INC.**

JOHNSON, HEIDEPRIEM &
   ABDALLAH, LLP

Scott N. Heidepriem
Ronald A. Parsons, Jr.
Shannon R. Falon
101 South Main Avenue, Suite 100
Sioux Falls, SD 57104
Tel: (605) 338-4304
Fax: (605) 338-4162

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (*pro hac vice pending*)
Dane H. Butswinkas (*pro hac vice pending*)
Carl R. Metz (*pro hac vice pending*)
725 Twelfth Street NW
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029

*Attorneys for Defendants American Broadcasting Companies, Inc.,
ABC News, Inc., Diane Sawyer, Jim Avila, and David Kerley*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 4

    A.    The ABC News Reports ............................................................................ 4

    B.    The Complaint ............................................................................................ 7

GOVERNING STANDARDS ........................................................................................ 8

ARGUMENT ................................................................................................................ 10

I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE SOUTH DAKOTA AGRICULTURAL FOOD PRODUCTS DISPARAGEMENT ACT (COUNT 26) ........................................................................................... 10

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR COMMON LAW PRODUCT DISPARAGEMENT (COUNTS 10–18, 23–25) ......................... 12

    A.    The AFPDA Is the Exclusive Basis for Liability for Disparagement of Agricultural Food Products. ........................................................ 13

           1.    Enactment of the Agricultural Food Products Disparagement Act. ........................................................ 13

           2.    The AFPDA Contains the Exclusive Remedy for Disparagement of Agricultural Food Products. ................ 16

    B.    The Common Law Product Disparagement Claims Fail on Their Own Terms ........................................................................................ 21

           1.    The False Statement Claims Should Be Dismissed. ........... 22

                a.    The Rhetorical Hyperbole "Pink Slime" Is Not Actionable (Count 10) ................................................ 22

                b.    The Words "Filler" and "Substitute" Are Substantially True or Non-Actionable Opinion (Counts 12-13) ................................................ 26

i

        c.    Statements that LFTB Comes from Low-Grade Trimmings Are Substantially True or Non-Actionable Opinion (Count 15). ................................................29

        d.    Statements that Trimmings Were Once Used "Only" for Certain Purposes and that the Protein in LFTB Comes "Mostly" from Connective Tissue Are Substantially True (Counts 16 and 18). ...................................32

        e.    The Statement that LFTB Has a Consistency "More Like Gelatin" Is Substantially True or Non-Actionable Opinion (Count 17). ................................................34

    2.    The False Implication Claims Should Be Dismissed. ........................35

        a.    The ABC News Reports Do Not Imply That LFTB Is "Not Safe for Public Consumption" (Count 24). ...................36

        b.    The ABC News Reports Do Not Imply LFTB Is "Not Nutritious" (Count 25). ................................................36

        c.    The ABC News Reports Do Not State or Imply that LFTB Is "Not Beef or Meat" (Counts 11 and 23) ...................38

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR LIBEL. ..............................41

    A.    Most of the Libel Claims (Counts 1-4, 6-9, and 19-21) Are Mislabeled Product Disparagement Claims. ...................................41

    B.    The References to "Economic Fraud" and "Food Fraud" Are Not Actionable as Libel of BPI (Count 5). ................................................45

    C.    The Alleged Implication of Improper Conduct Is Not Sustainable (Count 22). ................................................................................48

IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS. ................................................49

CONCLUSION .................................................................................................52

**<u>TABLE OF AUTHORITIES</u>**

**FEDERAL CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................8

*Auvil v. CBS "60 Minutes,"* 800 F. Supp. 941 (E.D. Wash. 1992) .....................14, 15

*Auvil v. CBS "60 Minutes,"* 836 F. Supp. 740 (E.D. Wash. 1993) .....................14, 15

*Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864 (8th Cir. 2005)......... *passim*

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995) ............................50

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir. 1994) ..............................................................23, 49, 50

*Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U.S. 485 (1984) .....................22

*Bourne v. Arruda*, No. 10-CV-393-LM, 2011 WL 2357504 (D.N.H. June 10, 2011) .............31

*Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir. 1983).................50, 52

*Brown v. Popular Mechs.*, 37 F.3d 1503 (8th Cir.).......................................................9

*Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249 (W.D. Wa. 2007) ...................................38

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011)....................................................27

*Compuware Corp. v. Moody's Investors Sves., Inc.*, 499 F.3d 520 (6th Cir. 2007) ...................38

*Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. Star Tribune Co.*, No. 05-cv-735, 2005 WL 1661514 (D. Minn. July 15, 2005)..............................................................26

*Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811 (8th Cir. 2010) .............................................8, 35

*Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804 (8th Cir. 2011) ..................................... *passim*

*Fox Sports Net N., LLC v. Minn. Twins P'ship*, 319 F.3d 329 (8th Cir. 2003).................25, 29

*Greenbelt Coop. Publ'g Assn. v. Bresler*, 398 U.S. 6 (1970) .......................................................23

*Interphase Garment Solutions, LLC v. Fox TV Stations, Inc.*, 566 F. Supp. 2d 460 (D. Md. 2008)..............................................................51

*Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) ...........................................................27

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986) (en banc)......................................29

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998)......................................27

*Landers v. Nat'l R.R. Passenger Corp.*, 345 F.3d 669 (8th Cir. 2003) ............................... *passim*

*Letter Carriers v. Austin*, 418 U.S. 264 (1974) ......................................23

*Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997) ......................................31

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ......................................2, 9, 29, 33

*McBride v. Merrell Dow & Pharm. Inc.*, 717 F.2d 1460 (D.C. Cir. 1983) ......................................4

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ............................... *passim*

*Moore v. Credit Inform. Corp. of Am.*, 673 F.2d 208 (8th Cir. 1982) ......................................34

*Mr. Chow v. Ste. Jour Azur S.A.*, 759 F.2d 219 (2d Cir. 1985) ......................................25

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ......................................3

*Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763 (8th Cir. 1927) ......................... *passim*

*Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999) ......................................46

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ......................................51

*Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir.), *cert. denied* 474 U.S. 843 (1985)..................49

*Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2001) ......................................27

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ......................................9, 47

*Schuster v. U.S. News & World Report, Inc.*, 602 F.2d 850 (8th Cir. 1979) ......................................3

*Times, Inc. v. Hill*, 385 U.S. 374 (1967) ......................................3

*Treutler v. Meredith Corp.*, 455 F.2d 255 (8th Cir. 1972)......................................24, 34, 36, 46

*U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914 (3d Cir. 1990)......................................2, 42, 44

*Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990), *cert. denied*, 499 U.S. 961 (1991)......................................22, 49

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ......................................24

## STATE CASES

*Advanced Training Sys. v. Caswell Equip. Co.*, 352 N.W.2d 1 (Minn. 1984) ..........................45

*Burnett v. Myers*, 173 N.W. 730 (S.D. 1919) ......................................................17, 18, 19, 20, 21

*Castle Rock Remodeling, LLC v. Better Bus. Bureau*, 354 S.W.3d 234
   (Mo. Ct. App. 2011) ..................................................................................................38

*City of Lemmon v. U.S. Fid. & Guar. Co.*, 293 N.W.2d 433 (S.D. 1980) ......................17, 18, 19

*Dulgarian v. Stone*, 652 N.E.2d 603 (Mass. 1995) ....................................................................51

*Dykstra v. Page Holding Co.*, 766 N.W.2d 491 (S.D. 2009) ......................................................50

*Finck v. City of Tea*, 443 N.W.2d 632 (S.D. 1989) ..............................................................24, 25

*Gist v. Macon Cnty. Sheriff's Dep't*, 671 N.E.2d 1154 (Ill. App. Ct. 1996) ............................27

*Gregory's, Inc. v. Haan*, 545 N.W.2d 488 (S.D. 1996)........................................................41, 42

*Groseth Int'l, Inc. v. Tenneco Inc.*, 440 N.W.2d 276 (S.D. 1989) ..........................................9, 35

*Hagemann ex rel. Estate of Hagemann v. NJS Eng'g, Inc.*, 632 N.W.2d 840 (S.D. 2001) .........10

*Hohm v. City of Rapid City*, 753 N.W.2d 895 (S.D. 2008) ................................17, 18, 19, 20, 21

*Huggins v. Povitch*, No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)..........51

*Kirby v. Smith*, 224 N.W. 230 (S.D. 1929) ................................................................................14

*Mashburn v. Collin*, 355 So. 2d 879 (La. 1977)........................................................................25

*McCullough v. Visiting Nurse Serv. of S. Me.*, 691 A.2d 1201 (Me. 1997) ..............................33

*McKeon v. Ewert*, 226 N.W. 754 (S.D. 1929) ....................................................................18, 19

*Melaleuca, Inc. v. Clark*, 78 Cal. Rptr. 2d 627 (Cal. Ct. App. 1998)........................................45

*Myers v. Plan Takoma, Inc.*, 472 A.2d 44 (D.C. 1983)..........................................................3, 8

*Paint Brush Corp. v. Neu*, 599 N.W.2d 384 (S.D. 1999) ..........................................................25

*Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82 (Nev. 2002) ....................................................25

*Petition of Famous Brands, Inc.*, 347 N.W.2d 882 (S.D. 1984)................................................10

*Rudolph v. Herman*, 56 N.W. 901 (S.D. 1893) ...................................................................10, 20

*Schimke v. Karlstad*, 208 N.W.2d 710 (S.D. 1973) ...................................................................19

*Scotvold v. Scotvold*, 298 N.W. 266 (S.D. 1941) ......................................................................19

*Seminole Tribe v. Times Publ'g Co.*, 780 So. 2d 310 (Fla. Dist. Ct. App. 2001) ......................52

*State v. Shadbolt*, 590 N.W.2d 231 (S.D. 1999) .......................................................................17

*Steak Bit of Westbury, Inc. v. Newsday, Inc.*, 334 N.Y.S.2d 325 (N.Y. Sup. Ct., Nassau
 Cnty. 1972) .............................................................................................................................25

*Themed Rests., Inc. v. Zagat Survey, LLC*, 781 N.Y.S.2d 441 (N.Y. Sup. Ct., N.Y.
 Cnty. 2004) *aff'd*, 801 N.Y.S.2d 38 (App. Div. 2005).............................................................38

## OTHER AUTHORITIES

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* ...............4, 8, 24, 49

Rodeny A. Smolla, *Rights and Liabilities in Media Content* (2d ed. 2011) ............................52

*American Heritage Dictionary* (5th ed. 2011).........................................................................24

Restatement (Second) of Torts § 614 ............................................................................ *passim*

Restatement (Second) of Torts § 623A ...................................................................................41, 42

Restatement (Second) of Torts § 766 .....................................................................................52

Federal Rule of Civil Procedure 12(b)(6) .................................................................................3, 8

SDCL 1-1-23 ...........................................................................................................................17, 18

SDCL 1-1-24 ................................................................................................................... *passim*

SDCL 2-14-12 ................................................................................................................. *passim*

SDCL 15-2-13 ..........................................................................................................................16

South Dakota Agricultural Food Products Disparagement Act
 SDCL 20-10A-1 *et seq* ................................................................................................. *passim*

SDCL 20-11-3 ..........................................................................................................................41

## INTRODUCTION

In March and April of this year, ABC News broadcast reports concerning a product that its manufacturer, Beef Products, Inc. ("BPI"), calls "lean finely textured beef" or "LFTB" and others call "pink slime."  The product is not sold for human consumption on its own but since 1991 has been included as an ingredient in ground beef, without labeling or other notice to the public.  The ABC News reports informed the public about LFTB and about how it is perceived by its supporters and critics.  Within eight days of the first report, the United States Department of Agriculture ("USDA") changed the rules of the national school lunch program to allow schools a choice of whether to serve ground beef containing LFTB.  Three weeks after that, it changed labeling rules to allow consumers to know, for the first time, whether LFTB was in the ground beef they were purchasing at grocery stores.

BPI complains that its product was disparaged by these reports, and it seeks to recover for the loss in the public's appetite for LFTB.  The case thus poses a direct challenge to the right of ABC News to inform the public on a matter of obvious and legitimate public interest—a right that is firmly embodied in the law of South Dakota and the First Amendment.

At bottom, this is a product disparagement case.  BPI attempts to expand that single claim into a series of duplicative libel and tortious interference claims laid out in 27 separate counts.  Not one count states a viable claim:

1. BPI cannot state a claim under South Dakota's Agricultural Food Products Disparagement Act ("AFPDA"), because that law only authorizes an action for

statements that question the *safety* of a product, which ABC did not do.  *See* SDCL 20-10A-1(2) (actionable "disparagement" is a statement or implication "that an agricultural food product is not safe for consumption").  The ABC News reports repeatedly stated that LFTB is safe to eat.

2.     BPI cannot state a claim for disparagement of an agricultural food product under the common law, because any such claim is preempted by the AFPDA, and because the ABC News reports would not be actionable under traditional common law standards in any event.  For example, reporting that critics call LFTB pink slime is not actionable:  that term, while unflattering, does not convey false facts about the color or texture of LFTB and is precisely the kind of "imaginative expression" and "rhetorical hyperbole" that is constitutionally protected.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 20 (1990).  And the ABC News reports cannot reasonably be understood to imply that LFTB is "not safe for public consumption" or "not nutritious."  Compl. ¶¶ 642, 658. The reports repeatedly state that LFTB is "safe to eat," though "not *as nutritious* as ground beef"—a viewpoint BPI does not challenge.  BPI's other claims are based on quibbles with specific language that do not affect the "substance" or "gist" of the reports.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991).

3.     BPI cannot state a claim for libel because statements that allegedly disparage a product (as opposed to a person or entity) can only give rise to product disparagement claims, not libel claims.  *See Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 771 (8th Cir. 1927); *U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914, 924 (3d Cir. 1990).  Here, the only two claims that sound in libel fail as a matter of law because

ABC's statements are not reasonably capable of bearing the meanings that BPI alleges. *See, e.g., Landers v. Nat'l R.R. Passenger Corp.*, 345 F.3d 669, 672 (8th Cir. 2003); Restatement (Second) of Torts § 614.  Specifically, ABC News did not state or imply that BPI engaged in unlawful or fraudulent conduct in connection with the USDA's approval of LFTB, or in connection with how ***others*** label the ultimate ground beef products that are sold to consumers.

    4.    BPI's single claim of tortious interference with business relationships fails both because a plaintiff cannot circumvent the constitutional and other restrictions on defamation and product disparagement claims by reframing them as claims for tortious interference, and because BPI has not alleged the basic elements of a tortious interference claim.

    Although the Complaint is lengthy and seemingly complex, all of these issues are appropriately addressed on a motion to dismiss.  Indeed, it is vitally important that they be addressed at the outset, because libel claims directly challenge free speech, and the mere pendency of these cases threatens to inhibit additional speech.  "[T]he Supreme Court has recognized that the cost of defending a protracted [defamation] lawsuit can chill [F]irst [A]mendment rights." *Schuster v. U.S. News & World Report, Inc.*, 602 F.2d 850, 855 (8th Cir. 1979) (citing *Times, Inc. v. Hill*, 385 U.S. 374, 389 (1967), and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)).  In the context of claims challenging speech, "perhaps more than any other, the early sifting of groundless allegations from meritorious claims made possible by a Rule 12(b)(6) motion is an altogether appropriate and necessary judicial function." *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. 1983);

*see also McBride v. Merrell Dow & Pharm. Inc.*, 717 F.2d 1460, 1466-67 (D.C. Cir. 1983) ("In the First Amendment area, summary procedures are even more essential"); Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, §§ 16.2.1, 16-5 & n.15 (collecting cases).

BPI's complaint, which seeks $1.2 billion in damages, directly challenges the right of a national news organization, two USDA scientists, and a former BPI employee to explore matters of obvious public interest—what is in the food we eat and how that food is labeled.  The complaint also inhibits others who might address these subjects in a public forum.  The sheer volume of BPI's 257-page pleading only compounds the threat and should not shield the claims from the scrutiny that they demand.[1]

### BACKGROUND

#### A.    The ABC News Reports

On March 7, 2012, ABC reported on its "World News" program that "70% of the ground beef we buy at the supermarket" contains the product that the "industry calls lean finely textured beef" and others call "pink slime."  Compl. Ex. 2 (3/7/12 World News).  The ABC News report described the process by which LFTB is manufactured from trimmings—explaining that the trimmings are gathered, heated "to make it easier to separate fat from muscle," "[p]ut in a centrifuge and spun to finish the separation,"

---

[1] Concurrently with this Motion, the ABC Defendants are filing a separate Motion to Dismiss All Claims of Plaintiffs BPI Technology, Inc. and Freezing Machines, Inc.  While the points and authorities identified in this Memorandum are equally applicable to those plaintiffs, their claims fail at an even more basic level because they are not the producers of the allegedly disparaged product, not the subject of the ABC News reports, and not real parties in interest.

4

exposed to "ammonia gas to kill bacteria," and then "finally compressed into bricks and flash frozen for shipment." *Id*. The report included interviews with two former USDA Food Safety Inspection Service (FSIS) microbiologists—defendants Gerald Zirnstein, who dubbed the product pink slime, and Carl Custer. *Id*. The report pointed out that LFTB "doesn't have to appear on the label" of ground beef sold in supermarkets. *Id*.

In the following weeks, ABC continued to report on the story, both online and on its television news programs, following up on questions from consumers. Among other things, viewers wanted to know which supermarkets sold ground beef containing LFTB, and ABC provided them with answers—reporting on developments as supermarket chains announced their policies over the coming weeks. *E.g.*, Compl. Ex. 3 (3/8/12 World News); Compl. Ex. 4 (3/9/12 World News); Compl. Ex. 9 (3/21/12 World News). The reports carried responses from the meat industry, including an interview with an American Meat Institute spokeswoman who argued that no additional labeling should be required for ground beef containing LFTB: "It's beef. It's on the label. It's a beef product. It says beef." Compl. Ex. 4 (3/9/12 World News). ABC also provided more information on the LFTB product, including an interview with Kit Foshee, a former senior employee at BPI, *see* Compl. Ex. 3 (3/8/12 World News), and statements from professors specializing in animal science and nutrition. A nutritionist at Rutgers University, for instance, reviewed data from a study of LFTB and discussed its nutritional value:

> "Pink slime" does provide nutrition, but not as much as ground beef, according to Richard Ludescher, a nutritionist at Rutgers University. . . . Ludescher said that because lean

> finely textured beef has five times the collagen level as
> standard beef it "will have a lower nutritional value than
> beef muscle."  Collagen is a protein, he said, that is higher in
> non-essential amino acids than meat from an animal's
> muscle.  "Addition of LFTB would thus lower the nutritional
> quality of ground beef," Ludescher said.

Compl. Ex. 23 (3/27/12 Online Report).

ABC closely covered the federal government's response and eventually reported on a new government policy that allowed school districts to choose to buy ground beef without LFTB: "Today, action.  The USDA announcing that, due to consumer demand, it will offer a choice to schools."  Compl. Ex. 6 (3/15/12 World News).  ABC also reported on the debate over whether the government should require labeling, featuring advocates on both sides.  *E.g.*, Compl. Ex. 4 (3/9/12 World News); Compl. Ex. 10 (3/26/12 World News).  And ABC reported on a new government program to allow for the voluntary labeling of ground beef containing LFTB and to "stamp them with USDA approval."  Compl. Ex. 26 (4/3/12 Online Report).  ABC also reported that BPI was "endorsing" the move by the USDA.  *Id.*

When lawyers for BPI sent a letter defending LFTB as USDA-approved beef and "nutritious," Compl. Ex. 58, ABC included that defense in a broadcast the same day. Compl. Ex. 4 (3/9/12 World News).  When BPI released a video defending its product, ABC included an excerpt on air:  "What we make is 100% lean beef.  And we do so with great attention to quality and safety."  Compl. Ex. 7 (3/16/12 World News).  When BPI held press conferences to defend its product against criticism, ABC devoted "World News" segments to the press conferences, providing viewers with a look inside a

"pristine" plant that produces LFTB.  Compl. Ex. 10 (3/26/12 World News); Compl. Ex. 11 (3/29/12 World News).

ABC News also repeatedly reiterated in its broadcasts and online reporting that LFTB is "safe to eat."  *See infra* p. 11 (quoting broadcasts).

### B.    The Complaint

Plaintiffs are three separate corporate entities, all commonly owned by the Roth family:  Beef Products, Inc., BPI Technology, Inc., and Freezing Machines, Inc.  Compl. ¶¶ 25-27.  Only Beef Products, Inc. ("BPI") is alleged to manufacture LFTB, and only BPI is named or referred to in the ABC News reports.[2]

The Complaint names as defendants American Broadcasting Companies, Inc. and ABC News, Inc., as well as senior national correspondent Jim Avila, correspondent David Kerley, and "World News" anchor Diane Sawyer.  Also named as defendants are Zirnstein and Custer, the two former USDA scientists, and Foshee, the former BPI employee who spoke out about LFTB.

The Complaint contains 27 separate counts against the ABC defendants.  BPI claims that isolated "false statements" and alleged "implications" constitute common law defamation and product disparagement (Counts 1-25).  BPI further alleges a cause of action under South Dakota's statutory Agricultural Food Products Disparagement Act (Count 26) and one count of common law tortious interference (Count 27).

---

[2]  In the Complaint, the term "BPI" is specially defined to refer to all three plaintiffs.  *See* Compl. ¶¶ 25, 29.  In this motion, defendants will refer to each plaintiff individually, using the term BPI as it is customarily used—to refer to Beef Products, Inc. alone.  *See, e.g.,* Compl. Ex. 46-47, 58.

## GOVERNING STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In the context of defamation and product disparagement claims, "perhaps more than any other, the early sifting of groundless allegations from meritorious claims made possible by a Rule 12(b)(6) motion is an altogether appropriate and necessary judicial function." *Myers*, 472 A.2d at 50. This early sifting is warranted because, "unlike most litigation, in a libel suit the central event—the communication about which suit has been brought—is literally before the judge at the pleading stage." 2 Sack, *Sack on Defamation* at § 16.2.1, 16-3 & n.4 (collecting cases). Early sifting of groundless claims is also necessary, because the law of libel and product disparagement incorporates important First Amendment protections and the very pendency of these claims chills and inhibits free speech. The law therefore assigns a critical role to the Court to determine at the outset whether a libel or product disparagement complaint states a claim. For example:

- It is for the Court to decide as a matter of law "whether a communication is capable of bearing a particular meaning, and . . . whether that meaning is defamatory." Restatement (Second) of Torts § 614; *see also Fisher v. Wal-Mart Stores, Inc.,*

8

619 F.3d 811, 820 (8th Cir. 2010); *Landers*, 345 F.3d at 672; *Groseth Int'l, Inc. v. Tenneco Inc.*, 440 N.W.2d 276, 279 (S.D. 1989) (where a court finds a statement is "not capable of being and is not defamatory . . . that issue should not have been submitted to the jury").

- It is a fundamental principle of libel law that the allegedly libelous statement must be "of and concerning" the plaintiff, *Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966), and that issue is commonly resolved on a motion to dismiss. *See, e.g.*, *Brown v. Popular Mechs.*, 37 F.3d 1503 (table) (8th Cir.).

- Only provably false statements of objective fact are potentially actionable. The First Amendment protects subjective statements of opinion that do not convey a "provably false factual connotation," as well as criticism consisting of "imaginative expression," "rhetorical hyperbole" or even "vigorous epithet[s]." *Milkovich*, 497 U.S. at 17, 20.  It is for the Court to enforce these constitutional protections at the very outset of a case. *See, e.g., Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 868-71 (8th Cir. 2005).

- Finally, a plaintiff cannot plead a claim for libel or product disparagement by raising technical or literal objections.  "[S]ubstantial truth"—not literal truth—is required, and "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516-17 (1991) (internal quotation marks omitted).  It is important for the Court to consider what BPI concedes in its Complaint to be true in determining whether the alleged inaccuracies, even if proved, are actionable falsehoods. *See, e.g., Aviation Charter, Inc.*, 416 F.3d at 869-70.

9

These and the other issues presented herein are questions of law that can and should be decided on a motion to dismiss.

<u>**ARGUMENT**</u>

**I.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE SOUTH DAKOTA AGRICULTURAL FOOD PRODUCTS DISPARAGEMENT ACT (COUNT 26).**

Under South Dakota's Agricultural Food Products Disparagement Act ("AFPDA"), SDCL 20-10A-1 *et seq.*, "[a]ny producer of perishable agricultural food products who suffers damage as a result of another person's disparagement of any such perishable agricultural food product has a cause of action for damages and any other appropriate relief in a court of competent jurisdiction." *Id.* at 20-10A-2.  Disparagement is defined to mean a false statement or implication "that an agricultural food product is ***not safe*** for consumption by the public or that generally accepted agricultural and management practices make agricultural food products ***unsafe*** for consumption by the public." *Id.* at 20-10A-1(2) (emphases added).  That definition is "clear, certain and unambiguous," and therefore requires no interpretation.  *Petition of Famous Brands, Inc.*, 347 N.W.2d 882, 885 (S.D. 1984) ("This court assumes that statutes mean what they say and that legislators have said what they meant"); *see also Hagemann ex rel. Estate of Hagemann v. NJS Eng'g, Inc.*, 632 N.W.2d 840, 843 (S.D. 2001) (effect must be given to "the plain, ordinary meaning of the language used by the legislature"); *Rudolph v. Herman*, 56 N.W. 901, 903-04 (S.D. 1893) ("[W]here a statute creates a liability where otherwise none exists, or incurs a common-law liability," the "courts will not extend or

10

enlarge the liability by construction, nor will they go beyond the clearly expressed provision of the act" to "embrace cases not in the language of the statute").

The ABC News reports cannot reasonably be understood to imply that LFTB is unsafe. To the contrary, the reports repeatedly state the opposite—that LFTB is safe to eat. Compl. Ex. 9 (3/21/12 World News) ("the USDA and food industry experts agree that lean, finely textured beef *is safe* and wholesome"); Compl. Ex. 7 (3/16/12 World News) ("The government agrees the product *is safe*."); Compl. Ex. 6 (3/15/12 World News) ("The USDA is clear in saying, pink slime *is safe*."); Compl. Ex. 5 (3/13/12 Good Morning America) (Dr. Richard Besser, ABC News' Chief Health and Medical Editor: "Bottom line, FDA says *it's safe*"); Compl. Ex. 3 (3/8/12 World News) ("the USDA says *it's safe to eat*"); Compl. Ex. 15 (3/9/12 Online Report) ("the United States Department of Agriculture says *it's safe to eat*"); Compl. Ex. 16 (3/14/12 Online Report) (same); Compl. Ex. 10 (3/26/12 World News) ("The USDA says BPI's product *is safe* to eat[.]"); Compl. Ex. 22 (3/26/12 Online Report) ("the USDA says *it's safe to eat*"); Compl. Ex. 11 (3/29/12 World News) ("the USDA food safety undersecretary . . . assured the product *is safe to eat*") (emphases added in all quotations). Nowhere do the reports contradict these unequivocal statements.

BPI's allegation that ABC impugned the safety of LFTB is based on statements that do not concern the safety of the product at all, but instead concern its general desirability as a component of ground beef. Thus, BPI insists that ABC's use of the term pink slime necessarily "implied that LFTB was not safe for public consumption." Compl. ¶ 678. Likewise, BPI stretches the phrases "economic fraud" and "food fraud"

to somehow implicate the "safety" of LFTB, when on their face the terms do not relate to safety.  Compl. ¶ 679.  Similar exaggerations are made about other statements BPI claims to be actionable disparagement.[3]

What each of these allegations ignores is that the ABC News reports did not address the safety of LFTB through mere implication.  The broadcasts addressed safety ***directly***, repeatedly reminding ABC's audience that LFTB is safe for public consumption.  In the face of these unequivocal safety endorsements, which are nowhere contradicted, BPI cannot state a claim under the AFPDA.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR COMMON LAW PRODUCT DISPARAGEMENT (COUNTS 10–18, 23–25).

BPI attempts to escape the definition of "disparagement" of an agricultural food product under the AFPDA by asserting claims for product disparagement under the common law.  This fails for two reasons:  First, under bedrock principles of South Dakota law, the AFPDA offers the exclusive remedy for speech that is critical of an agricultural food product.  Second, even if the AFPDA did not preempt a common law disparagement claim, the Complaint would fail to satisfy the common law and constitutional standards for such a claim.

---

[3] Compl. ¶ 680 (alleging that such phrases as "low-quality" "low-grade" and "scraps" all imply LFTB is unsafe); Compl. ¶ 681 (same for statement that beef trimmings are used in dog food and cooking oil); Compl. ¶¶ 647 & 682 (same for statements characterized as being "derogatory" of LFTB); Compl. ¶¶ 648 & 683 (same for statements that production process includes "simmering [beef trimmings] at a low heat"); Compl. ¶¶ 649 & 684 (same for statements that ammonia gas is used "to kill bacteria" "so they are safe to eat").

**A.      The AFPDA Is the Exclusive Basis for Liability for Disparagement of Agricultural Food Products.**

Under deeply-rooted principles of South Dakota law, the Legislature's 1994 enactment of a statutory cause of action for disparagement of agricultural food products forecloses any attempt to obtain recognition of a common law version of the same tort. To our knowledge, before the statute was adopted no South Dakota court had ever recognized a common law claim for product disparagement.  And it would be improper to recognize a common law claim for disparagement of an agricultural food product after the Legislature enacted a statutory version of the same tort containing comprehensive liability standards and remedial schemes—many of which conflict with the standards that BPI wishes to have recognized under the auspices of the common law.  In such a circumstance, the statute displaces any common law claim, *see* SDCL 1-1-24, and fully "establishes the law of this state respecting the subjects to which it relates," *id.* at 2-14-12.

The 12 counts that assert liability under a common law theory of agricultural product disparagement (Counts 10-18 and 23-25) have no basis in law and should be dismissed.

**1.      Enactment of the Agricultural Food Products Disparagement Act.**

As with most states' agricultural product disparagement statutes, the AFPDA was enacted in the aftermath of the litigation in *Auvil v. CBS "60 Minutes,"* in which apple growers in Washington State tried unsuccessfully to impose common law

product disparagement liability for television news reports questioning the safety of apples treated with the pesticide "Alar."[4]

At the time the *Auvil* case was litigated, courts in South Dakota had not recognized a common law cause of action for product disparagement. Nor had they done so for the closely-related torts of libel and slander—two causes of action that have long been defined in South Dakota by statute rather than the common law. *See, e.g., Kirby v. Smith*, 224 N.W. 230, 231 (S.D. 1929) (citing the statutory basis for slander and libel claims).

In January 1994, S.B. 179, entitled "An Act to provide for civil liability for the disparagement of agricultural and agricultural food products and agricultural management practices," was introduced. *See* Ex. A at 1 (legislative history). The bill adopted many of the features of the common law cause of action recognized in other states (such as the State of Washington in *Auvil*), including that "[a]ny producer of perishable agricultural food products who suffers damage as a result of another person's disparagement of any such perishable agricultural food product has a cause of action for damages." *Id.* at § 2. The proposed legislation thus embraced the essence of

---

[4] Plaintiffs' common law claims failed for essentially two reasons: First, the district court found that certain statements were not "of and concerning" the plaintiffs' apples because they only related to the use of Alar generally and not the plaintiffs' apples in particular. *See Auvil v. CBS "60 Minutes*," 800 F. Supp. 941, 943-45 (E.D. Wash. 1992) ("*Auvil II*") (dismissing claims against National Resources Defense Council). Second, as to those statements that were "of and concerning" the plaintiffs' apples, the plaintiffs themselves could not create a triable question of fact regarding the falsity of the CBS reports. *Auvil v. CBS "60 Minutes*," 836 F. Supp. 740, 743 (E.D. Wash. 1993) ("*Auvil III*"), *aff'd*, 67 F.3d 816 (9th Cir. 1995), *cert. denied* 116 S.Ct. 1567 (1996).

the common law tort in other states (at least is it relates to agricultural products), by recognizing a cause of action *by the producer* for damages resulting from the disparagement *of the producer's product*.

However, the bill expressly departed from other states' common law principles in ways that both expanded and contracted liability.  It expanded common law disparagement to include not only false statements or implications about the plaintiff's product, but also statements and implications regarding any "[g]enerally accepted agricultural and management practices" used in the production of that product, including "crop protection practices . . . and the feeding, transporting, housing, and health practices for livestock."  *Id.* at § 1(2) & (3).  The bill thereby provided for liability in circumstances in which the challenged statements only touch the product indirectly by disparaging an underlying agricultural practice.  *Cf. Auvil II*, 800 F. Supp. at 943-45 (dismissing claims arising from statements that criticized a pesticide used by apple growers, but that stopped short of criticizing apples directly).  In addition, the bill expanded upon the common law by providing that in addition to actual damages, the producer could in certain cases recover treble damages.  S.B. 179 § 3.

At the same time, the bill limited liability in ways many common law jurisdictions did not.  Whereas the common law generally requires product disparagement plaintiffs to prove that the defendant's statements were made with "actual malice," *Auvil III*, 836 F. Supp. at 742—that is, with knowing falsity or reckless disregard for the truth—the statute only imposes liability on statements the defendant "knows to be false," *see* S.B. 179 § 1(1).  Additionally, the bill defines "disparagement"

15

to mean the dissemination of false information that "states or implies that an agricultural food product is ***not safe*** for consumption by the public," *id.* § 1(2) (emphasis added); statements criticizing agricultural food products on non-safety grounds are not "disparagement." Finally, the bill imposed a one-year statute of limitations, *id.* § 4, far less than the six years provided for most common law torts, *see* SDCL 15-2-13, and half as long as the period provided for defamation claims in South Dakota, *id.* at 15-2-15.

The bill was approved by both chambers of the Legislature, and signed into law on February 23, 1994. *See* Ex. A at 9. It was codified at SDCL 20-10A-1 *et seq*, adjoining the neighboring chapter of the South Dakota Code containing the statutory codifications of libel and slander, *id.* at 20-11-1 *et seq.*

### 2. The AFPDA Contains the Exclusive Remedy for Disparagement of Agricultural Food Products.

Even if South Dakota had recognized a common law product disparagement claim before the AFPDA was enacted, there is no basis for BPI's theory that there is common law liability for disparagement of agricultural food products today, in addition to the statutory liability created by the AFPDA. When the Legislature enacts a statute respecting a tort claim that also exists at common law, and in so doing "goes further than to merely restate the common law right" and instead "prescribes the method of procedure to secure the remedy" and "cover[s] the whole subject-matter of damages . . . [and] the rules of practice to be followed in such cases," then "[i]t is clear, from the degree of minuteness with which the Legislature went into the whole subject,

16

that the remedy provided was intended to be exclusive." *Burnett v. Myers*, 173 N.W. 730, 730-31 (S.D. 1919) (rejecting argument that a statutory right was "cumulative, and not exclusive" of a pre-existing common law remedy); *see also Hohm v. City of Rapid City*, 753 N.W.2d 895, 903-06 (S.D. 2008) (applying *Burnett* to hold that statute contains exclusive remedy, notwithstanding prior recognition of a related common law claim); *City of Lemmon v. U.S. Fid. & Guar. Co.*, 293 N.W.2d 433, 439 (S.D. 1980) (dismissing common law action that improperly circumvented the limitations on liability contained in a statute addressed to the same subject matter).

As the South Dakota Supreme Court recently explained in *Hohm*:

> The test for whether a statute overrides a previously recognized common-law doctrine was established in our first Territorial Code of 1877:
>
> > . . . In this state the rules of the common law, including the rules of the law merchant, are in force, except where they conflict with the will of the sovereign power, expressed in the manner stated in § 1-1-23.
>
> SDCL 1-1-24 (originally Rev. Code Terr. Dak, Civil Code §§ 5 & 6 (1877)). *One of the methods of expressing the "will of the sovereign power" in SDCL 1-1-23* (originally Rev. Code Terr. Dak, Civil Code § 3 (1877)) *to override the common law is "[b]y statutes enacted by the Legislature[.]" Thus, in case of a conflict, the statute controls.*

*Hohm*, 753 N.W.2d at 903 (emphasis added).

Moreover, South Dakota law is clear that "[w]here a statute is in derogation of common law, it should be 'liberally construed with a view to effect its objects and to promote justice.'" *Id.* (quoting *State v. Shadbolt*, 590 N.W.2d 231, 233 (S.D. 1999)); *see also*

*City of Lemmon*, 293 N.W.2d at 439 (same).  This principle sets South Dakota apart from other jurisdictions, in which statutes in derogation of the common law are as a rule read narrowly.  *See McKeon v. Ewert*, 226 N.W. 754, 755 (S.D. 1929) (contrasting South Dakota law with the traditional rule).  In South Dakota, the state "code establishes the law of th[e] state respecting the subjects to which it relates," SDCL 2-14-12, and nullifies pre-existing common law rules respecting the same subject matter.  *McKeon*, 226 N.W. at 755.

In reliance on these principles, South Dakota courts have long held that where a comprehensive statute not only addresses the same subject matter as the common law, but revises it in some material respect, the conclusive presumption is that the Legislature intended to enact an exclusive statutory remedy that displaces the related common law claim.  Thus, in *Burnett*, plaintiff sought to recover under an established common law tort of trespass by animals, notwithstanding his failure to comply with the terms of a statute that provided a remedy for the same offense.  173 N.W. at 730.  The South Dakota Supreme Court affirmed the dismissal of plaintiff's claim, finding that when the Legislature enacted the statutory version of that tort, it "define[d] the right and prescribe[d] the remedy," and "necessarily exclude[d] both as common law."  *Id.* at 731 (citing the predecessors to SDCL 1-1-23 and 2-14-12).

In *Hohm*, plaintiffs were the parents of a teenager who suffered severe brain injuries after a car in which he was a passenger skidded off the road and landed upside down in a canal.  753 N.W.2d at 897.  The parents sued the city in which the accident occurred under a recognized common law doctrine that imposed liability on

18

governmental authorities when they failed to maintain roads and highways in a safe condition.  *Id.* at 897-98.  Citing *Burnett*, the Court held that the common law duty had been extinguished by a statute that "did not merely restate the common-law duty of municipalities as to maintenance of streets, [but] prescribed the new statutory duties . . . , enacted criminal penalties, and created a civil cause of action for violation of those duties."  *Id.* at 904.  From those provisions, "it [was] clear from the degree of minuteness with which the legislature went into the whole subject, that the act was intended to be exclusive, and that it was the intent of the legislature to repeal any other acts or provisions of common law pertaining to the same subject."  *Id.*  Plaintiffs' common law cause of action was abrogated by statute.  *Id.* at 905.

These are but two examples in a long line of cases finding that a South Dakota statute implicitly preempts related common law rights.  *See also City of Lemmon*, 293 N.W.2d at 439 (statutory cause of action by surety against principal preempted common law causes of action against other defendants); *Schimke v. Karlstad*, 208 N.W.2d 710, 712-14 (S.D. 1973) (statute respecting property rights preempted common law rights); *Scotvold v. Scotvold*, 298 N.W. 266, 269 (S.D. 1941) (statutes vesting married women with independent property rights preempted inconsistent common law claims); *McKeon*, 226 N.W. at 755 (common law tolling doctrine implicitly repealed by statute specifying different grounds for tolling).

These principles apply in full measure to BPI's attempt to assert common law liability over the same subject matter—disparagement of agricultural food products—

19

that the Legislature expressly addressed in a statute, the AFPDA.[5]  In the parlance of *Hohm* and *Burnett*, the AFDPA does not merely restate the common law cause of action for product disparagement; it defines the right, specifies who may sue, when they must initiate the suit, what they must prove about the underlying statement (that it was false, and that it states or implies an agricultural food product is unsafe for human consumption), what they must prove about the speaker's state of mind (that he knew the statement was false), and what may be recovered in damages under two different levels of intent (actual damages, or treble damages if the speaker acted with intent to harm the plaintiff).  *See* SDCL 20-10A-1 *et seq.*

Indeed, the Legislature defined the very word disparagement in a way that clearly precludes liability for the types of statements BPI challenges here: "disparagement" means the dissemination of false information that "states or implies that an agricultural food product is not safe for consumption by the public."  SDCL 20-10A-1(2).  It is fundamentally inconsistent with that definition to assert a cause of action for "disparagement" based on statements that do not reflect on a food product's safety, as BPI seeks to do in Counts 10–18, 23, and 25.  *Cf. Rudolph*, 56 N.W. at 903-04 ("[W]here a statute creates a liability where otherwise none exists, or incurs a common-law liability" the courts will not "embrace cases not in the language of the statute").

---

[5] This is not to say that the AFPDA displaces the common law of disparagement for other types of products.  The statute displaces the common law on "the subjects to which it relates," SDCL 2-14-12, namely, the alleged disparagement of an agricultural food product, such as LFTB.

In these circumstances, the preemptive effect of the Act is even more clear than in *Hohm* and *Burnett*. In those cases, the applicable statutes were found to have preempted common law claims that had already been recognized by South Dakota courts. Where, as here, the legislature creates a remedy for agricultural product "disparagement" that had not previously been recognized in any published decision of a South Dakota court, resort to the common law is without the slightest justification. South Dakota, unlike many other states, has long defined the right of action for defaming a person or entity by statute, rather than by the common law. Here, it has done the same thing for disparagement of an agricultural food product. Where the legislature has expressly defined what constitutes disparagement of such a product, it would nullify the statute to recognize a different definition of disparagement as a matter of common law. That sort of nullification has the law exactly backwards. *See* SDCL 1-1-24.

For these reasons, the AFPDA provides the exclusive remedy in South Dakota for the alleged disparagement of agricultural food products. The common law claims that attempt to impose liability for disparagement of such products in circumstances that the Legislature did not see fit to allow should be dismissed on that ground alone.

**B.** **The Common Law Product Disparagement Claims Fail on Their Own Terms.**

Even if BPI's common law claims for disparagement of LFTB were not preempted by South Dakota's statutory scheme, they would all fail as a matter of law because they rest on non-actionable hyperbole and opinion, asserted defamatory meanings that are not conveyed by the ABC News reports, and hypertechnical factual

21

distinctions that the law does not recognize as bases for liability.  First Amendment protections apply fully to product disparagement actions.  *E.g.*, *Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U.S. 485, 490 (1984) (applying First Amendment principles in product disparagement case); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990), *cert. denied*, 499 U.S. 961 (1991) ("[C]laims for product disparagement, or 'trade libel,' . . . are subject to the same [F]irst [A]mendment requirements that govern actions for defamation").  The statements challenged here are fully protected by the First Amendment, as well as the principles of the common law.

        **1.**      **The False Statement Claims Should Be Dismissed.**

BPI does not allege that ABC falsely described the process by which LFTB is produced.  It concedes that LFTB, unlike traditional ground beef, is the product of a "mechanical" process in which refrigerated "trimmings" are "tempered back to about 105 degrees," "put through two different centrifuges," introduced to "ammonia gas . . . to help remove any potential pathogens," and then "frozen" before being added into ground beef.  Compl. ¶¶ 53-59.  BPI challenges a dozen different ways in which the result of that process is characterized.  But none of those characterizations give rise to legal claims.  They are either expressions of opinion that are not provably false, or they are substantially true.

        **a.**      **The Rhetorical Hyperbole "Pink Slime" Is Not Actionable (Count 10).**

It is hard to imagine a more prototypical example of non-actionable "rhetorical hyperbole" or "imaginative expression," *Milkovich*, 497 U.S. at 17, 20, than the term

"pink slime."  BPI prefers to use the euphemism "lean finely textured beef," or "LFTB,"

to describe its product.  But product critics and others are no less free to use the epithet

pink slime.

Pink slime may sound unflattering or critical.  But it is precisely because the

long-used term is inherently a ***subjective*** assessment that it does not give rise to a legal

claim.  Simply put, pink slime is not actionable because it is not a "provably false

statement of fact."  *See Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 811 (8th Cir. 2011).

It is well-settled that "imaginative expression" and "rhetorical hyperbole"—even

"vigorous epithet"—are constitutionally protected.  *Milkovich*, 497 U.S. at 20.  The

Supreme Court has held, for instance, that calling a business's negotiating position

"blackmail" was not actionable, because "the word was no more than rhetorical

hyperbole, a vigorous epithet."  *Milkovich*, 497 U.S. at 16-17 (quoting *Greenbelt Coop.*

*Publ'g Assn. v. Bresler*, 398 U.S. 6, 13-14 (1970)).  Likewise, the Court has held the term

"traitor" non-actionable when it was used "in a loose, figurative sense" and as "mere[]

rhetorical hyperbole, a lusty and imaginative expression of . . . contempt."  *Milkovich*,

497 U.S. at 17 (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974)).

Courts across the country have applied these well-settled principles to reject

defamation claims over similar—and, indeed, far more vituperative —terminology than

employed in the ABC News reports.  Insults from "rude" to "disgrace," descriptions

from "unfair" to "stupid" to "cheap," and expressions that are all-but unprintable have

all been held to be non-actionable.  *See, e.g., Beverly Hills Foodland, Inc. v. United Food &*

*Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) ("'Unfair' is a term

23

requiring a subjective determination and is therefore incapable of factual proof."); 2 Sack at §§ 2-45-50 (collecting cases).   In the end, "name calling, either express or implied, does not . . . give rise to an action for libel."  *Finck v. City of Tea*, 443 N.W.2d 632, 636 (S.D. 1989) (quotation marks omitted).

BPI argues that LFTB does not fit its preferred dictionary definition of the term "slime."  Compl. ¶¶ 173, 179.[6]  But "language must be interpreted in its ordinary and popular sense, rather than in a technical manner."  *Treutler v. Meredith Corp.*, 455 F.2d 255, 258 (8th Cir. 1972).   ABC's use of the words pink slime cannot reasonably be viewed as literally alleging that the product is "slime" in any technical sense.  And any value judgment reflected in some dictionary definitions of the term are just that—value judgments that cannot amount to false assertions of fact.

Pink slime is exactly the sort of "loose, figurative, or hyperbolic language" that courts recognize demands protection under the First Amendment.  *Milkovich*, 497 U.S. at 21.  It may be "a lusty and imaginative expression of . . .  contempt," but it is not a false statement of verifiable fact.  *Id*. at 17; *see also, e.g.*, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624-25 (D.C. Cir. 2001) ("[t]he article's single reference to 'paranoia' is certainly pejorative, but the author deploys its popular, not clinical, sense"; it is "rhetorical sophistry, not a verifiably false attribution.").  Pink slime, in short, is exactly the sort of

_____

[6]  BPI fails to mention the more neutral definitions of slime, some of which appear in the same dictionaries it cites—for example, the first definition of slime in the *American Heritage Dictionary* (5th ed. 2011) is "a thick, sticky, slippery substance," which certainly fits LFTB.

24

"name calling" that cannot, as a matter of law, give rise to a lawsuit.  *Finck*, 443 N.W.2d at 636.  BPI may argue it is "inflammatory," but "it is not defamatory."  *Fox Sports Net N., LLC v. Minn. Twins P'ship*, 319 F.3d 329, 337 (8th Cir. 2003).

Courts have consistently held that similarly unpleasant descriptions of food cannot be actionable as a matter of law.  *See e.g.*, *Mashburn v. Collin*, 355 So. 2d 879, 887-91 (La. 1977) (statements that a dish was "trout à la green plague," a sauce was "glop," and another sauce was like "yellow death on duck" are constitutionally protected opinion despite the fact that, taken out of context, the statements would appear to be allegations of fact); *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 89 (Nev. 2002) (statement that a restaurant's food "came out of some sort of package" is protected opinion and not fact in the context of a restaurant review); *Steak Bit of Westbury, Inc. v. Newsday, Inc.*, 334 N.Y.S.2d 325, 328-30 (N.Y. Sup. Ct., Nassau Cnty. 1972) (statement that a restaurant served "mostly all fake food, ground-up schmutz" was not actionable because its "real meaning . . . in the context of the article [wa]s not literal, but rather denotive of quality"); *Mr. Chow v. Ste. Jour Azur S.A.*, 759 F.2d 219, 226-29 (2d Cir. 1985) (statements that "the sweet and sour pork contained more dough . . . than meat," "the green peppers . . . were 'still frozen' on the plate," "the fried rice was 'soaking . . . in oil,'" and "the pancakes were the 'thickness of a finger'" were protected opinion).

Finally, to the extent the words "pink slime" could be understood as conveying any "provably false statement of fact," *Fjelsta*, 488 F.3d at 811—or any "objectively verifiable" meaning, *Paint Brush Corp. v. Neu*, 599 N.W.2d 384, 395 (S.D. 1999)—rather than hyperbole or subjective opinion, such facts are not actionable because they are

substantially, if not literally, true.  BPI does not dispute that LFTB is pink.  Nor does it dispute that LFTB—much like all ground beef—is slimy.  Indeed, in the original patent application for the flash-freezing technology used in producing LFTB, Compl. ¶ 59, BPI's founder explained that freezing was necessary because the "protein material" recovered in his process is, before cooling, a "*viscous paste*," having a "*viscous pastelike consistency*."[7]  Ex. B, at 1, 4 (emphases added); *see also* Compl. ¶ 59.[8]  In the end, BPI may not like the term pink slime, but it can hardly complain that the term is a substantially false assertion of fact.

> **b.    The Words "Filler" and "Substitute" Are Substantially True or Non-Actionable Opinion (Counts 12-13).**

BPI's inability to plead disparagement is illustrated by Counts 12 and 13, in which BPI complains of ABC's references to LFTB as a "filler" and a "substitute."  BPI's own complaint and the exhibits incorporated therein reveal without question that these terms are substantially accurate.  *E.g., Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. Star*

---

[7] Significantly, half of the "slime" dictionary definitions quoted by BPI at Compl. ¶ 173 include the adjective "viscous."

[8] The application states, in relevant part:  "The present invention finds utility in the recovery from animal fat and like undesirable animal products protein material that has significant food value.  Fat is separated from the protein material by heating a mixture of the constituents to melt the fat, and the residue, which contains the protein material, must be cooled quickly to prevent deterioration. . . .  *The protein material has a viscous pastelike consistency even when at the elevated temperature in consequence of which it is not freely flowable*.  Accordingly, it is an object of the present invention to provide a cooling drum apparatus equipped to afford distribution of the *viscous paste* material thereon."  Ex. B at 4 (emphasis added).  Although other modifications to the process for producing LFTB have been made, to defendants' knowledge none changes the consistency of the underlying viscous paste material.

*Tribune Co.*, No. 05-cv-735, 2005 WL 1661514, at *4 (D. Minn. July 15, 2005) (granting motion to dismiss where plaintiff had "implicitly conced[ed] the truth of the statements" in its pleadings); *Carpenter v. King*, 792 F. Supp. 2d 29, 37-38 (D.D.C. 2011), *aff'd*, 473 Fed. App'x 4 (D.C. Cir. 2012) (dismissing defamation claim because the statement at issue was substantially true in light of admissions in plaintiff's complaint); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998) (dismissing defamation claim because complaint admitted that plaintiff was a "suspect," rendering the statement that he was a "prime" or "main" suspect substantially true); *Gist v. Macon Cnty. Sheriff's Dep't*, 671 N.E.2d 1154, 1157-58 (Ill. App. Ct. 1996) (affirming dismissal of defamation claim because the "essence" of the statement was "substantially true").

Indeed, in any context it is well established that "a plaintiff can plead himself out of court by alleging facts which show that he has no claim." *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995); *see also, e.g.*, *Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2001) ("[W]hile notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition" (internal citations omitted)). That is squarely the case here.

BPI's Complaint confirms that the point of its "innovations" was to produce a lower-cost product to be added in varying quantities to ground beef in place of more traditional, more expensive sources of ground beef. *See, e.g.*, Compl. ¶¶ 63-64, 95. There is no contention that LFTB is or was ever sold as a separate, stand-alone product. As an American Meat Institute press release attached to BPI's Complaint explains, "LFTB is not consumed by itself, but rather is a component of some ground beef at

27

levels of approximately 10 to 15 percent." Compl. Ex. 88 (3/29/12 AMI Statement). In a word, the very purpose of LFTB is to be ***added*** to ground beef that does not undergo the same mechanical processing. Compl. ¶ 51.

One need look no further than the exhibits attached to BPI's Complaint—documents that BPI alleges ABC should have relied upon, *see, e.g.*, Compl. ¶¶ 206-09—to see that BPI's claims amount to inconsequential quibbling over word choice. One article that BPI criticizes ABC for allegedly ignoring specifically calls LFTB a "low-cost additive*."* Compl. Ex. 35 (1/9/12 FSN Article). And a BPI-run website explains that LFTB is "blended into ground beef." Compl. Ex. 70 (3/15/12 BPI Article); *see also* Compl. Ex. 32 (4/19/11 AMI letter) ("Ammonium hydroxide is used to produce a lean meat product that is added to ground beef."); Compl. Ex. 59 (3/8/12 AMI Press Release) ("[LFTB] is blended into foods like ground beef."); Compl. Ex. 84 (3/26/12 AMI Press Release) ("Lean finely textured beef has been processed for two decades, blended into ground beef at very low levels . . . ."). In the face of these clear concessions in its own statements and exhibits, BPI cannot argue that ABC's use of the words "substitute" and "filler" was substantially untrue—that "the gist" of those words is any different from what BPI acknowledges to be the truth.

To the extent that BPI's real complaint is that the words "filler" and "substitute" convey a more negative opinion of the LFTB product than it would prefer, that disagreement is not actionable. Any subjective assessment conveyed through the words "filler" and "substitute" would not be a "provably false statement of fact." *See Fjelsta*,

488 F.3d at 811; *see also, e.g., Fox Sports Net North, LLC*, 319 F.3d at 337 ("[I]mprecise language that, at most, casts [a plaintiff] in a negative light" will not give rise to claim.).

When considering these and, indeed, all of BPI's claims, it is important to consider this warning from the Eighth Circuit:  "[T]he First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words.  Editors' grilling of reporters on word choice is a necessary aggravation. But when courts do it, there is a chilling effect on the exercise of First Amendment rights."  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) (en banc) (internal citations omitted).[9]

> ### c. Statements that LFTB Comes from Low-Grade Trimmings Are Substantially True or Non-Actionable Opinion (Count 15).

BPI complains about the words ABC used to describe the raw material from which LFTB is produced.  But it ignores the context in which those words were used and fails to allege—as it must—that the "gist" of ABC's descriptions was false.  *Masson*, 501 U.S. 496, 516-17.  ABC explained that the process of making LFTB begins with "low-grade," "low quality" or "waste" "trimmings" or "scraps."  It then explained how those trimmings are "gathered, simmered at low heat to make it easier to separate fat from muscle, put in a centrifuge and spun to finish the separation."   Compl. Ex. 2 (3/7/12

---

[9] Count 14—challenging statements by a former USDA scientist calling the labeling of ground beef containing LFTB "economic fraud" and "food fraud"—does not  state a claim for product disparagement for the reasons addressed below, *see infra* Section III.B, and for the additional reason that they are not about the product itself.  Instead, those statements are about those responsible for the labels that failed to notify consumers that the ground beef they buy contains the cheaper LFTB.

World News).  Thus, the words that BPI complains of are not used to describe the end product, but the raw material.  And there is no question that the raw material was accurately described.

BPI concedes that LFBT is made from "trimmings," Compl. ¶ 532, and it is hard to imagine a more accurate term to describe those trimmings than "scraps."  One need only look at the video of these trimmings traveling down a conveyor belt to know that calling them scraps was—at a minimum—substantially accurate.  *See* Ex. C (screenshot from 3/29/12 World News).  Excerpts from a BPI-sponsored website attached to BPI's Complaint describe these trimmings as "pieces of fat that contain small portions of beef."  Compl. Ex. 69 (3/10/12 BPI FAQ).

It was substantially accurate for ABC to call those pieces of fat containing small portions of beef "low-quality" or "low-grade" trimmings.  Again, BPI concedes that they are "higher-fat" than other cuts.  Compl. ¶ 49.  Indeed, according to an exhibit cited by BPI, "[t]he particular trim that goes into lean finely textured beef has a very high fat content.  So normally, there would be no way to recover the lean beef out of these trimmings."  Compl. Ex. 82 (3/20/12 Dr. Dickson Interview).  To any ordinary viewer, that trim could not be called anything other than low-quality or low-grade.  BPI's patent application even notes that its invention "finds utility" in otherwise "undesirable animal products."  Ex. B at 4.

If BPI's argument is that the term low-grade is inaccurate because "USDA uses a 'grading' system for whole beef carcasses" and "does not use a 'grading' system for beef trimmings," Compl. ¶ 248, this hypertechnical distinction cannot sustain a claim. "Low

grade" was used in the ABC News reports in a colloquial sense, not a technical one based on a USDA regulatory regime. Regardless, BPI acknowledges that it "receives and uses beef trimmings of all grade levels," including from carcasses that have not been graded at all ("no roll"). *Id.* at ¶ 248 n.8.

In any event, assessments like low-quality and low-grade are inherently subjective and, thus, non-actionable. In *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997), for instance, the court held that calling a competitor's store "trashy" was not actionable because "[u]nder the aegis of the First Amendment, a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning." Likewise, in *Aviation Charter*, the court held that a statement that an airline had an "unfavorable safety record" in comparison to other airlines was "not a provably false statement of fact" and, thus, non-actionable. 416 F.3d at 871 ("It is a subjective interpretation of multiple data points leading to a subjective conclusion about aviation safety"). The same rule plainly applies here with respect to a subjective conclusion about high-fat beef trimmings. *See also Bourne v. Arruda*, No. 10-CV-393-LM, 2011 WL 2357504 (D.N.H. June 10, 2011) (loose, figurative expressions like "junk" are "not generally actionable" in defamation cases, "as they cannot be proved or disproved by evidence").

Finally, it was substantially accurate for ABC News to refer once to the "pieces of fat that contain small portions of beef," Compl. Ex. 69 (3/10/12 BPI FAQ), as "waste trimmings." As a BPI-sponsored website explains, in excerpts attached to its

31

Complaint, LFTB products "recover lean meat that would ***otherwise be waste***." *Id.* (emphasis added).  That is, "BPI produces a boneless lean beef product from trim that is ***usually lost***."  Compl. Ex. 33 (3/6/12 BPI Fact Sheet); *see also* Compl. Ex. 68 (3/10/12 BPI Article) (same); Compl. Ex. 34 (11/7/11 Innovations Video) ("What BPI has done is taken a process so that even more of the animal can be utilized, that nothing goes to ***waste***."); Compl. Ex. 35 (1/9/12 FSN Article) ("For those of you who don't know the company, BPI produces a boneless lean beef product from trim that is ***usually lost***."); Compl. Ex. 59 (3/8/12 AMI Article) ("it recovers lean meat that would otherwise be ***wasted***"); Compl. Ex. 82 (3/20/12 Dr. Dickson Interview) ("It is meat that without being processed would go to ***waste***") (emphases added in all quotations).  ABC can hardly be faulted for using the same term as BPI.

> **d.**     **Statements that Trimmings Were Once Used "Only" for Certain Purposes and that the Protein in LFTB Comes "Mostly" from Connective Tissue Are Substantially True (Counts 16 and 18).**

Counts 16 and 18 are based on the allegation that ABC chose the wrong adverb to qualify statements that are otherwise concededly true.  But such adverbs alone, which do not affect the "gist" of the allegedly disparaging statement, cannot support a claim.

In Count 16, BPI challenges the statement that the beef trimmings used to make LFTB were "once [before BPI developed its process] only used in dog food and cooking oil."  The trimmings, it alleges, were not "only" used in those products.  Compl. ¶ 539.  But BPI concedes the trimmings were once used in "dog food and cooking oil"—in fact,

one of the exhibits that BPI contends ABC should have relied upon explains that "before BPI came up with a mechanized process to do this, such trimmings were **often** leftovers that ended up being used for pets or oils." Compl. Ex. 77 (3/9/12 FSN Article) (emphasis added).   A distinction between "often" and "only" is at most a "minor inaccurac[y]" that does not affect the "gist" of the statement. *Masson*, 501 U.S. at 516-17. And the context of the statement further eliminates any possible false and defamatory sting.  ABC was not referring to how LFTB itself was once used, but rather to how the fatty trimmings were used **before** the mechanical process was developed that turned those trimmings into LFTB.  That they were "often" used for pet food or cooking oil is undisputed; whether there were other uses for this raw material before BPI developed its process to separate meat from fat says nothing about the uses for the product that later resulted from that process.

Count 18 fails for similar reasons.  BPI complains of the statement that the protein in LFTB "comes mostly from connective tissue."  BPI does not dispute that there is protein in LFTB that comes from connective tissue, but it alleges simply that "LFTB's protein comes '***mostly from***' muscle meat."   Compl. ¶ 557 (emphasis added).  This difference over relative proportions does not affect the "gist" of the challenged statement, especially in context.  The statement was offered as an explanation of why LFTB is not "as nutritious as ground beef"—a statement that BPI does not challenge as false or defamatory.  Under the circumstances, it is immaterial whether the protein from connective tissue is more or less than 50 percent.  *E.g.*, *McCullough v. Visiting Nurse Serv. of S. Me.*, 691 A.2d 1201, 1204 (Me. 1997) (statement that plaintiff was fired because of

"several" incidents was substantially true when she was actually fired for two incidents).

This allegation is just the type of excessively technical pleading of falsity that does not give rise to a cause of action.  *See, e.g.*, *Aviation Charter, Inc.*, 416 F.3d at 869-70 (while a statement "was technically incorrect . . . [n]onetheless, the statement in context was not defamatory"); *Moore v. Credit Inform. Corp. of Am.*, 673 F.2d 208, 210 (8th Cir. 1982) ("In defending on the basis of truth, it is not necessary that the precise facts stated in the (report) be literally true." (quotation marks omitted)).

> ### e. The Statement that LFTB Has a Consistency "More Like Gelatin" Is Substantially True or Non-Actionable Opinion (Count 17).

BPI again errs in pleading Count 17 by relying on technical definitions over common sense.  ABC reported that "critics say" that LFTB is "more like gelatin than beef."  Compl. Ex. 4 (3/9/12 World News).  That was false, BPI alleges, "because LFTB is not gelatin" according to the dictionary definition of the term.  Compl. ¶¶ 217, 546, 549.  But ABC did not report that LFTB "is" technically gelatin as opposed to beef.  Critics said it was "more like gelatin," and in context it is clear that the reports were referring to the consistency of the substance.  Words must be treated in their "ordinary and popular sense, rather than in a technical manner."  *Treutler*, 455 F.2d at 258.  And the court "must consider the context within which the statement was made."  *Aviation Charter, Inc.*, 416 F.3d at 868; *Treutler*, 455 F.2d at 258.

There is nothing false, much less defamatory, about reports that critics have opined that the consistency of LFTB is more like that of gelatin than that of beef.  BPI

has not alleged that the consistency is more like beef than gelatin.  Nor could it make such an allegation.  As noted above, in the words of BPI's founder the "protein material" that issues from BPI's mechanical separation process is, before flash-freezing, a "viscous paste."  Ex. B, at 4.  Whatever the consistency of the product after it fully emerges from BPI's process and is mixed into ground beef, it cannot be substantially untrue to say that the consistency is "more like" gelatin than beef.  In the end, whether a substance has a consistency more like gelatin than beef is a subjective judgment, not a provably false statement of fact.  *See, e.g.*, *Fjelsta*, 488 F.3d at 811.  And since LFTB is never meant to be consumed by itself, it is difficult to comprehend how any comment about its consistency could be regarded as defamatory.

### 2.    The False Implication Claims Should Be Dismissed.

Not content to rest its claims on what ABC actually said in its reports, BPI seeks to assert claims based on what ABC did not say.  To be sure, a broadcaster may be held responsible in some circumstances for meanings that its words can fairly be read to convey, even if those meanings are not made explicit.  But it is for the court to determine in the first instance whether a news report can reasonably be understood to bear the particular implied meaning that is alleged.  *See, e.g.*, *Landers*, 345 F.3d at 672 (question of whether challenged words are reasonably capable of defamatory meaning is question of law for the court); Restatement (Second) of Torts § 614 ("The court determines . . . whether a communication is capable of bearing a particular meaning, and . . . whether that meaning is defamatory"); *Groseth Intern., Inc.*, 440 N.W.2d at 279; *Fisher*, 619 F.3d at 820.  "[T]he words complained of cannot be isolated and must be

35

considered in the context of the entire television or radio broadcast." *Treutler*, 455 F.2d at 258.

<ol type="a" start="1">
<li><strong>The ABC News Reports Do Not Imply That LFTB Is "Not Safe for Public Consumption" (Count 24).</strong></li>
</ol>

The implication that BPI strains the hardest to divine from ABC's reporting is that LFTB is "not safe for public consumption." Compl. ¶ 643. As explained above, *see supra* pp. 10-12, ABC never stated or implied any such thing. To the contrary, the reports repeatedly emphasized exactly the opposite message—that LFTB is safe to eat. *Id.* Count 24, therefore, should be dismissed.

<ol type="b" start="2">
<li><strong>The ABC News Reports Do Not Imply LFTB Is "Not Nutritious" (Count 25).</strong></li>
</ol>

The ABC News reports cannot be read to imply that LFTB is "not nutritious." They state an opinion that LFTB is "not ***as nutritious*** as ground beef," Compl. Ex. 3 (3/8/12 World News); *see also* Compl. Ex. 4 (3/9/12 World News) ("Critics say pink slime is . . . less nutritious."). But BPI does not allege that that comparative opinion is false and defamatory. Instead, BPI alleges that ABC implied that LFTB is "not nutritious" ***at all***. As a matter of law, the ABC News reports are not reasonably susceptible of this extreme meaning.

In fact, ABC explained that LFTB "does provide nutrition," Compl. Ex. 23 (3/27/12 Online Report), and told viewers that "the USDA and food industry experts agree that lean finely textured beef is safe and wholesome," Compl. Ex. 9 (3/21/12 World News). ABC quoted a letter from BPI attorneys saying the product "is nutritious." Compl. Ex. 4 (3/9/12 World News); *see also, e.g.*, Compl. Ex. 23 (3/27/12

Online Report) ("BPI said the product is as 'safe and nutritious as ground beef.'").  ABC reported that governors from meat-producing states assert the product is "safe and nutritious."  Compl. Ex. 11 (3/29/12 World News).  ABC even quoted an animal science professor opining that LFTB "is nutritious food," explaining that "[a]ll beef is a good or excellent source of 10 essential nutrients, including protein, iron, zinc and B vitamins."  Compl. Ex. 15 (3/9/12 Online Report).[10]

Citing a nutritionist at Rutgers University, ABC did explain that LFTB "has five times the collagen level as standard ground beef."  Compl. Ex. 23 (3/27/12 Online Report).  As a result, it "will have a lower nutritional value than beef muscle" because, while a protein, collagen "is higher in non-essential amino acids and lower in essential amino acids."  *Id*.  Nowhere in the 257 pages of the Complaint does BPI allege that this analysis is incorrect.

There is a significant difference between noting that LFTB may not be as nutritious as other ingredients of ground beef and saying that LFTB is "not nutritious" at all.  ABC was careful to say only the former and cannot be held responsible for the latter.[11]  As a matter of law, therefore, Count 25 should be dismissed.

---

[10] Taken in context, Defendant Foshee's statement that protein from connective tissue will "fill you up.  But it's not gonna do you any good," was presented as supportive of the point that LFTB is "not as nutritious as ground beef."  Comp. Ex. 3 (3/8/12 World News).  That one quotation did not change the overall meaning of the ABC reports.

[11]  Nor could BPI assert a claim based on the assessment that LFTB is not "as nutritious" as other ingredients of ground beef.  Such a comparative assessment is a protected subjective opinion.  *See Aviation Charter, Inc.*, 416 F.3d at 871 (statement that airline had an "unfavorable safety record" in comparison to other airlines is not actionable); *see also*

        **c.**    **The ABC News Reports Do Not State or Imply that LFTB Is "Not Beef or Meat" (Counts 11 and 23).**

BPI complains that the ABC News reports falsely state (Count 11) or imply (Count 23) that LFTB is not beef or not meat.  They do neither.  The broadcasts make clear precisely what LFTB is and then offer critics' opinions as to how it compares to "what the typical lay person would consider meat."  These kinds of reports are fully protected by the First Amendment.

From the first moments of the first broadcast, ABC told viewers that LFTB came from "[b]eef trimmings."  Compl. Ex. 2 (3/7/12 World News).[12]  The reports show what those trimmings look like and accurately describe the process by which they become LFTB—how those trimmings are "gathered, simmered at low heat to make it easier to separate fat from muscle, put in a centrifuge and spun to finish the separation."  Compl. Ex. 2 (3/7/12 World News).   What remains, based on that description, is "muscle," which BPI alleges is the definition of "meat."  Compl. ¶ 203.  In short, the broadcasts make clear that LFTB is derived from beef trimmings that consist of muscle and fat, and that BPI's process removes the fat, leaving muscle, which BPI defines as meat.

---

*Compuware Corp. v. Moody's Investors Sves., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (credit rating is a non-actionable opinion); *Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249, 1251–53 (W.D. Wa. 2007) (website rating lawyers is non-actionable opinion); *Castle Rock Remodeling, LLC v. Better Bus. Bureau*, 354 S.W.3d 234, 242-43 (Mo. Ct. App. 2011) (BBB's rating of a business is non-actionable opinion); *Themed Rests., Inc. v. Zagat Survey, LLC*, 781 N.Y.S.2d 441, 448 (N.Y. Sup. Ct., N.Y. Cnty. 2004) *aff'd*, 801 N.Y.S.2d 38 (App. Div. 2005) (numerical rankings of restaurant is non-actionable opinion).

[12] *See also, e.g.*, Compl. Ex. 9 (3/21/12 World News) ("[R]emember, this is a beef product."); Compl. Ex. 4 (3/9/12 World News) (quoting American Meat Institute representative: "It's a beef product.  It says beef.  This is beef."); Compl. Ex. 10 (3/26/12 World News) (quoting Regina Roth: "[I]t's a hundred percent beef.").

To be sure, the ABC News reports depict critics saying that LFTB is not "fresh ground beef," and that "it's not what the typical lay person would consider meat." *E.g.*, Compl. ¶ 489. But these statements are either indisputably true or non-actionable matters of opinion. After all, BPI admits that LFTB is exposed to ammonia and flash-frozen before it leaves the plant. *E.g.*, Compl. ¶ 59. As these critics see it, such a product is not "fresh" and "not what the typical lay person would consider meat." One may disagree with these opinions—though it is hard to see how—but opinion is all that they are. Presenting these critics' opinions is a far cry from stating as a fact that LFTB is "not beef" or "not meat" at all.

Nor does reporter Avila's statement that "[i]t is not the same as ground beef," Compl. ¶ 489(m), amount to a statement that LFTB is not beef at all. BPI admits that no one would ever cook and consume LFTB on its own. It cannot even be purchased by consumers on its own: "LFTB is not consumed by itself, but rather is a component of some ground beef." Compl. Ex. 88 (3/29/12 AMI Statement). In other words, it "is not the same as ground beef," just as Avila reported.

Likewise, BPI cannot create a claim out of another critic's comment that he "didn't . . . consider" or "didn't feel it was meat" "because it was a salvage product." Compl. ¶ 489(g). LFTB is, in fact, produced from trimmings that were salvaged from what would otherwise have been waste. *See supra* 29-32. For a critic to say that, for this reason, he did not "consider" or "feel" that it was meat is obviously a matter of opinion. And especially in the context of a report that accurately explains how LFTB results from

the separation of muscle (meat) from fat, that opinion cannot reasonably be understood as a factual statement that LFTB does not consist of muscle.[13]

In short, Counts 11 and 23 do not state claims because ABC's reports did not state, and cannot reasonably by understood to mean, that LFTB is not beef or meat.

*          *          *          *          *

For these reasons, none of BPI's assertions of falsity supports a viable cause of action for product disparagement, even if non-safety related statements could give rise to a common law claim for disparagement of an agricultural food product under South Dakota law.  But even if a single statement might be deemed false and otherwise actionable under the common law, any such statement must be considered in the context of the entirety of the reports.  Given how much there is in ABC's reports that is unquestionably true, and that is *at least as* unflattering as anything that could conceivably be challenged as false, it is BPI's burden to identify some significant falsehood that on its own caused the injuries of which it complains.  *Aviation Charter*, 416 F.3d at 870 (holding that "any potential harm caused by the improper characterization" at issue "was overshadowed by at least three other eye-catching observations").  BPI has not come close to meeting that mark, and for that reason, as well, all claims for product disparagement should be dismissed.

---

[13]   The Complaint also cites a tweet from Avila in which he states that "no one said this slime is dangerous.  It's just not what it purports to be.  Meat.  And if it's in ground beef it should be labeled."  Compl. ¶ 489(n).  In the context of all of the reports, that single, brief statement (to a very limited audience) can only be understood as an opinion in line with the other opinions discussed above.

### III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR LIBEL.

In addition to its product disparagement claims, BPI asserts a duplicative set of claims alleging that the same statements and alleged implications constitute libel.  All but two of these claims, however, relate to the nature and quality of BPI's product, not to BPI's corporate reputation.  As a result, they can only sound in product disparagement, not in libel.  The two counts that do sound in libel fail because they are contradicted by what the ABC News reports actually said and prohibited by what the law of libel requires.

### A.   Most of the Libel Claims (Counts 1-4, 6-9, and 19-21) Are Mislabeled Product Disparagement Claims.

South Dakota law defines libel as "a false and unprivileged publication . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."   SDCL 20-11-3.   Libel is different from product disparagement, in that "[t]he action for defamation is to protect the personal reputation of the injured party," *Gregory's, Inc. v. Haan*, 545 N.W.2d 488, 493 n.2 (S.D. 1996) (quoting Restatement (Second) of Torts § 623A cmt. g), whereas the action for product disparagement is to protect the value of a product.  "If the statement reflects merely upon the quality of what the plaintiff has to sell or solely on the character of his business," then the cause of action is for product disparagement alone.  Restatement (Second) of Torts § 623A cmt. g.

Because the law of defamation "protect[s] . . . personal reputation," *Haan*, 545 N.W.2d at 493 n.2, courts have long recognized that a challenged publication is not

actionable as libel if it "is directed against the goods or product[s] of a corporate vendor or manufacturer." *Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 771 (8th Cir. 1927). To be actionable as libel, the publication must "impute[] to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product." *Id.*; *see also, e.g.*, *U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914, 924 (3d Cir. 1990). The Restatement explains that, "[a]lthough it might be possible to imply some accusation of personal incompetence or inefficiency in nearly every imputation directed against a business or a product, the courts have insisted that something more direct than this is required for defamation." Restatement (Second) of Torts § 623A cmt. g. Only where "the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity or that he is perpetrating a fraud upon the public by selling something that he knows to be defective," will the statement give rise to a claim for defamation. *Id.*; *see also Haan*, 545 N.W.2d at 493 n.2 (quoting Restatement (Second) of Torts § 623A cmt. g).

Only two of BPI's libel claims arguably satisfy this standard: Count 5, which complains of a reference to "economic fraud" and "food fraud"; and Count 22, which complains of an alleged (but unreasonable) implication that BPI engaged in improper conduct to gain USDA approval for LFTB. Those claims are discussed in Parts B and C below. The other 11 libel counts are based on statements that are purely about BPI's product (LFTB), not the integrity, financial soundness or competence of BPI itself. Those counts, summarized below, must stand or fall under the law of product disparagement, not the law of libel:

- <u>Count 1</u>: BPI alleges defamation based on statements that "LFTB [is] 'pink slime.'" Compl. ¶ 389.

- <u>Count 2</u>: BPI alleges defamation based on statements that "LFTB is not beef or meat." Compl. ¶ 401.

- <u>Count 3</u>: BPI alleges defamation based on statements "call[ing], describ[ing], or referr[ing] to LFTB as a 'filler' added to ground beef." Compl. ¶ 412.

- <u>Count 4</u>: BPI alleges defamation based on statements "call[ing], describ[ing], or referr[ing] to LFTB as a 'substitute' for beef." Compl. ¶ 422.

- <u>Count 6</u>: BPI alleges defamation based on statements that described "LFTB as being produced from 'waste,' 'low-quality' or 'low-grade trimmings or 'scraps.'" Compl. ¶ 441.

- <u>Count 7</u>: BPI alleges defamation based on statements that "the beef trimmings used to make LFTB were 'once only used in dog food and cooking oil.'" Compl. ¶ 451.

- <u>Count 8</u>: BPI alleges defamation based on statements "call[ing], describ[ing], or refer[ing] to LFTB as 'more like gelatin than beef.'" Compl. ¶ 459.

- <u>Count 9</u>: BPI alleges defamation based on statements that "LFTB's 'protein comes mostly from connective tissue, and not muscle meat.'" Compl. ¶ 468.

- <u>Count 19</u>: BPI alleges defamation based on statements implying that "LFTB was not beef and not even meat." Compl. ¶ 563.

- <u>Count 20</u>: BPI alleges defamation based on statements implying that "LFTB was not safe for public consumption." Compl. ¶ 579.

- <u>Count 21</u>: BPI alleges defamation based on statements implying that "LFTB was not nutritious." Compl. ¶ 595.

These statements are plainly "directed against the goods or product" of BPI—*i.e.*,

LFTB. They do not impute to BPI any "fraud, deceit, dishonesty, or reprehensible

43

conduct in its business in relation to said goods or product." *Benzo Gas*, 20 F.2d at 771. The statements accordingly cannot support a cause of action for libel.[14]

Courts across the country have promptly rejected similar libel claims on the same ground. The Eighth Circuit in *Benzo Gas*, for example, rejected libel claims brought by a seller of "Benzo Gas"—a mixture of benzol and gasoline—against a competitor who had distributed leaflets stating that Benzo Gas was of lower quality than pure gasoline. 20 F.2d at 764–65 & n.1. The court found "nothing in [the statements] which reflects on the honesty or integrity of plaintiff; nothing that imputes to it fraud or deception; nothing which indicates reprehensible methods in the conduct of its business." *Id.* at 771.

More recently, in *Blue Cross*, the Third Circuit followed what it described as the "time honored" decision in *Benzo Gas* to reject defamation claims brought by one health insurer (U.S. Healthcare, Inc.) against another (Blue Cross/Blue Shield) arising out of its aggressive comparative advertising campaign. 898 F.2d at 917–18, 924. The Third Circuit considered a group of statements that "either compare the competing health plans on one or more points, or simply criticize the competitor's health plan without detailed exposition of the advertiser's own competing plan." *Id.* at 926. Because "none of these [statements] could be said to impute to the competitor by fair construction any 'fraud, deceit, dishonesty, or reprehensible conduct,'" "no cause of action for defamation will lie with regard to these." *Id.* (quoting *Benzo Gas*, 20 F.2d at 771).

---

[14] To the extent any of these claims can be considered as libel claims, they fail for the same reasons discussed in Section II.B, *supra*, addressing the counterpart product disparagement claims.

Likewise, in *Melaleuca, Inc. v. Clark*, 78 Cal. Rptr. 2d 627, 630-31 (Cal. Ct. App. 1998), a seller of household products brought defamation claims against a scientist who claimed to have found a carcinogen in plaintiff's products.  The court rejected the defamation claims because the defendant "did not make any statements about the manner in which [the plaintiff] conducts its business, its honesty, or its reliability."  *Id.* at 639.  Rather, the defendant "only made statements about what she believes she found in products [the plaintiff] markets."  *Id.*; *see also, e.g.*, *Advanced Training Sys. v. Caswell Equip. Co.*, 352 N.W.2d 1, 8 (Minn. 1984) (statements that the plaintiff "produced unsound or 'shoddy' goods" did not give rise to a cognizable libel claim).

This Court should follow this "time honored" path and reject BPI's libel claims as a matter of law.

**B.     The References to "Economic Fraud" and "Food Fraud" Are Not Actionable as Libel of BPI (Count 5).**

In Count 5, BPI complains of Defendant Zirnstein's opinion, published on March 7 only, that the LFTB product amounted to "economic fraud" or "food fraud," because "[i]t's not fresh ground beef" but a "cheap substitute."  Compl. Ex. 13 (3/7/12 ABC Online); Compl. Ex. 27 (3/7/12 Twitter); *see also* Compl. ¶ 431.  BPI does not dispute that LFTB is "not fresh ground beef," or that it is "cheap" in relation to the bulk of the beef that goes into ground beef.  And for reasons discussed elsewhere, there can be no quarrel with the assertion that LFTB is a "substitute" for other sources of beef.  *See supra* pp. 26-29.  All that Count 5 complains about are the words "economic fraud" and "food fraud."  And those words are not actionable by BPI for at least three reasons:

45

*First*, these terms reflect the opinion of a former USDA scientist that consumers should be told that LFTB is in the ground beef that they buy.  That opinion is protected speech, regardless of how strongly it is expressed—regardless, in particular, of whether the scientist engaged in "rhetorical hyperbole"—or even "vigorous epithet"—in expressing it.  *Milkovich*, 497 U.S. at 17, 20.  Calling LFTB an "economic fraud" or a "food fraud" is no different than calling a business's negotiating position "blackmail" or deploying the term "traitor" as a "lusty and imaginative expression of . . . contempt."  *Milkovich*, 497 U.S. at 16-17; *see also, e.g.*, *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103–04 (N.D. Cal. 1999) (dismissing defamation action based on news report's use of terms "fraud" and "acted illegally," because "[s]uch an assertion is too loose and hyperbolic to be susceptible of being proved true or false").  These terms are not "provably false" statements of fact, *Fjelsta*, 488 F.3d at 811, and, thus, not actionable.

*Second*, the ABC News report cannot, in any event, be reasonably understood to mean that anyone actually engaged in fraud.  It is for this Court to determine in the first instance whether a challenged statement is reasonably capable of conveying the defamatory meaning plaintiffs allege.  *See, e.g.*, *Landers*, 345 F.3d at 672; Restatement (Second) of Torts § 614.  Again, "the words complained of cannot be isolated and must be considered in the context of the entire television or radio broadcast."  *Treutler*, 455 F.2d at 258.

In challenging the isolated references to "fraud," BPI acknowledges that the issue is one of "labeling."  Compl. ¶ 435.  The fraud references were false, BPI alleges, because the USDA had approved "includ[ing] LFTB in ground beef without additional

labeling." *Id.*  But the ABC News reports, including the only broadcast that used the term "economic fraud," explicitly stated that "USDA officials" had determined that "[LFTB] doesn't have to appear on the label."  Compl. Ex. 2 (3/7/12 World News); *see also* Ex. 13 (3/7/12 ABC Online).  In short, the reports themselves make clear that no one actually engaged in fraud as a legal matter or as a matter of fact.  To the contrary, the reports make clear that the government had approved the labeling decision.

*Third*, even if the ABC News reports could reasonably be understood to accuse anyone of having engaged in fraud by failing to alert consumers of the presence of LFTB, they cannot be understood as having leveled that charge *at BPI*.  The allegedly libelous statement must be "of and concerning" the plaintiff, *see Rosenblatt*, 383 U.S. at 82–83; *Brodsky*, 42 N.W.2d at 857, and nowhere in the 257-page Complaint does BPI contend that it was the party responsible for the labels placed on ground beef sold to consumers—or that ABC somehow stated or implied that it was.  The reports made clear that LFTB was not sold directly to consumers—and that those who purchased it from BPI to include in ground beef knew what they were purchasing.  Thus, even if the challenged statements somehow could be manipulated to "impute . . . fraud, deceit, dishonesty, or reprehensible conduct," *Benzo Gas*, 20 F.2d at 771, to some entity in connection with the labeling of consumer products, it would not be BPI, but those responsible for selling the ground beef that included the cost-saving LFTB to the public without disclosing that fact.

For all of these reasons, the isolated references to fraud are not actionable.

## C.   The Alleged Implication of Improper Conduct Is Not Sustainable (Count 22).

In Count 22, BPI alleges that ABC falsely implied "that BPI engaged in improper conduct to gain approval for LFTB from the USDA."  Compl. ¶ 613.  But there is nothing in the ABC News reports even remotely suggesting that BPI engaged in improper conduct in connection with the USDA's approval process.  *See Landers*, 345 F.3d at 672; *see also* Restatement (Second) of Torts § 614.

BPI points to statements that the Undersecretary of Agriculture who made the decision to approve LFTB was appointed to the board of directors of BPI's major supplier when she later stepped down from USDA.  Compl. ¶ 616.  But that does not suggest impropriety by BPI because: (1) the appointment was not to BPI's board; (2) it occurred after the person left the USDA; (3) BPI was not involved in the appointment; and (4) the appointment was not improper.  The first two points are clear from the statement itself.  The latter two are explicitly stated immediately thereafter—that "BPI says it had nothing to do with her appointment" to the board of its supplier, and that the appointment was "legal then."  Compl. Ex. 2 (3/7/12 World News).

BPI also cites statements to the effect that the USDA approved LTFB "over the objections of its own scientists," who were "overruled" by officials with "links to the beef industry."  Compl. ¶ 615.  But BPI does not contest the first two quotes; it only challenges the reference to industry links, and that reference cannot reasonably be understood to accuse BPI of misconduct.  It might raise a question whether a USDA official should have recused himself as a result of some unspecified tie to the beef

industry.  But the reports do not suggest that BPI had made unethical contact with any official or engaged in improper conduct in connection with the USDA's approval.

Nor can BPI base this claim on the fact that ABC described one of the USDA scientists in its initial reports as a "whistleblower."  Compl. ¶ 614.  There is no suggestion in the reports that this scientist was blowing the whistle on some improper conduct by BPI in the approval process.  To the contrary, it is clear that he was blowing the whistle on the product itself.  *See* Compl. Ex. 2 (3/7/12 World News) ("a whistleblower has come forward to tell consumers about the ground beef a lot of us buy"), Ex. 3 (2/8/12 World News ("Last night, a whistleblower told us about what he's calling pink slime . . . .").

In sum, Count 22 should be dismissed because the ABC News reports cannot reasonably be understood to accuse BPI of improper conduct in connection with the USDA's approval process.

## IV.  THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS.

The First Amendment protections that apply to claims of defamation and product disparagement apply equally to claims of tortious interference based on speech.  *See Beverly Hills Foodland*, 39 F.3d at 196; *see also Unelko Corp*, 912 F.2d at 1050; *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir.), *cert. denied* 474 U.S. 843 (1985); 2 Sack, *Sack on Defamation*, at § 13-41 & n. 200 (collecting cases).  "This is only logical as a plaintiff may not avoid the protection afforded by the Constitution . . . merely by the use of creative pleading."  *Beverly Hills Foodland*, 39 F.3d at 196.  Through their tortious

interference claims, BPI seeks to resuscitate their defamation and product disparagement claims merely by recasting them in terms of a different tort. BPI may not evade the protections of the First Amendment so easily.

As an initial matter, BPI's tortious interference claims fail for the same reasons that their defamation and product disparagement claims fail. Indeed, BPI's tortious interference claim rests on exactly the same statements and news reports that are insufficient to state claims for defamation and product disparagement. *See supra* Section III. To permit the tortious interference claims to proceed in these circumstances would be to permit BPI to benefit from just the type of "creative pleading" that courts across the country have prohibited. *Beverly Hills Foodland*, 39 F.3d at 196.

But even if BPI's other claims could be sustained, its tortious interference claim would still not be viable. That is because BPI does not—and cannot—plausibly allege the "strong showing of intent to disrupt ongoing business relationships" that tortious interference requires. *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995); *see also Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 499–500 (S.D. 2009). Courts across the country have rejected efforts to allege tortious interference claims arising out of newsgathering and reporting activities, on the ground that such activities cannot satisfy the "strong showing of intent" that tortious interference requires. The Seventh Circuit, for example, affirmed the dismissal of tortious interference claims against CBS on the ground that the plaintiff had failed to plead the requisite intent; according to the court, defendants' "interest was [only] to attract viewers to Jacobson and CBS." *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983)

50

(Posner, J.).   The court cautioned that "[a]ny libel of a corporation can be made to resemble in a general way this archetypal wrongful-interference case, for the libel will probably cause some of the corporation's customers to cease doing business with it."  *Id.* at 273.   "But this approach," the court explained, "would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations with which the law of defamation—presumably to some purpose—is hedged about."  *Id.* at 274.

A number of other courts have dismissed tortious interference claims arising out of news gathering and reporting activities on the same grounds.  *See Interphase Garment Solutions, LLC v. Fox TV Stations, Inc.*, 566 F. Supp. 2d 460, 465 (D. Md. 2008) (dismissing tortious interference claim based on newscast; "a plaintiff must show that the defendant's conduct was 'directed at' an existing or prospective economic relationship [and not] a mere 'incidental effect' of the allegedly wrongful conduct" (internal quotation marks omitted)); *Dulgarian v. Stone*, 652 N.E.2d 603, 609 (Mass. 1995) (affirming award of summary judgment where "[t]here is no indication that the report was broadcast for any reason other than the reporting on an issue of public concern"); *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *9 (N.Y. Sup. Ct. Apr. 19, 1996) (dismissing tortious interference claim based on a broadcast because "conduct [that] is intended to foster public awareness or debate cannot be . . . the wrongful or improper conduct required to sustain a claim for interference"); *cf. Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("The claim that the expressions were intended to exercise a

51

coercive impact on respondent does not remove them from the reach of the First Amendment.").

These considerations have led one court even to question "whether this common law cause of action could ever be stretched to cover a case involving news gathering and publication." *Seminole Tribe v. Times Publ'g Co.*, 780 So. 2d 310, 318 (Fla. Dist. Ct. App. 2001); *see also* Restatement (Second) of Torts § 766 cmt. c (explaining that, in evaluating tortious interference claim, the alleged harm must be balanced against "[the defendant's] interest and the societal interest in allowing the freedom claimed").[15] Because BPI has failed to plead that ABC's intent was anything other than "to attract viewers to [its programming]," *Jacobson*, 713 F.2d at 274, its tortious interference claim must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint against the ABC Defendants should be dismissed with prejudice.

Oral argument on this Motion is requested.

Respectfully submitted,

Kevin T. Baine (*pro hac vice pending*)
Dane H. Butswinkas (*pro hac vice pending*)
Carl R. Metz (*pro hac vice pending*)

---

[15] Indeed, as a leading treatise has put it, "it appears highly unlikely that [tortious interference] would be viable against a news organization or journalist"—even when it "accept[s] confidential information from a source that the reporter knows violates the source's contractual obligations to another." Rodeny A. Smolla, *Rights and Liabilities in Media Content* (2d ed. 2011).

WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
kbaine@wc.com
dbutswinkas@wc.com
cmetz@wc.com


JOHNSON, HEIDEPRIEM &
    ABDALLAH, LLP


/s/ Ronald A. Parsons, Jr.
Scott N. Heidepriem
Ronald A. Parsons, Jr.
Shannon R. Falon
101 South Main Avenue
Suite 100
Sioux Falls, SD 57104
Tel: (605) 338-4304
Fax: (605) 338-4162
scott@jhalawfirm.com
ron@jhalawfirm.com
shannon@jhalawfirm.com


*Attorneys for American Broadcasting Companies,
Inc., ABC News, Inc., Diane Sawyer, Jim Avila, and
David Kerley*

Dated: October 31, 2012

53

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

On October 26, 2012, undersigned counsel filed with the Court an Unopposed Motion to extend the word limit for the foregoing Memorandum from 12,000 to 15,000 words. *See* Motion for Leave to File Excess Pages, Dkt. # 15. The undersigned hereby certifies that, in accordance with Local Rule 7.1(B), this memorandum contains 14,963 words, inclusive of all footnotes and headings, and exclusive of the cover, table of contents, table of authorities, and counsels' names and addresses.

*/s/ Ronald A. Parsons, Jr.*
Ronald A. Parsons, Jr.

## <u>CERTIFICATE OF SERVICE</u>

On October 31, 2012, the foregoing MEMORANDUM IN SUPPORT OF ABC DEFENDANTS' MOTION TO DISMISS ALL CLAIMS OF PLAINTIFF BEEF PRODUCTS, INC., was filed electronically.  Copies of the foregoing document will be served on all counsel of record by operation of the Court's CM/ECF filing system.


/s/ Ronald A. Parsons Jr.
Ronald A. Parsons, Jr.