UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BEEF PRODUCTS, INC., BPI TECHNOLOGY, INC., and FREEZING MACHINES, INC., | Civ. No. 12-4183 |
| Plaintiffs, | Hon. Karen E. Schreier |
| v. | |
| AMERICAN BROADCASTING COMPANIES, INC., ABC NEWS, INC., DIANE SAWYER, JIM AVILA, DAVID KERLEY, GERALD ZIRNSTEIN, CARL CUSTER, and KIT FOSHEE, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

**ABC DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND, AND REPLY IN SUPPORT OF THEIR MOTION TO DISMISS ALL CLAIMS OF PLAINTIFFS BPI TECHNOLOGY, INC. AND FREEZING MACHINES, INC. FOR FRAUDULENT JOINDER AND FAILURE TO STATE A CLAIM**

JOHNSON, HEIDEPRIEM & ABDALLAH, LLP

Scott N. Heidepriem
Ronald A. Parsons, Jr.
Shannon R. Falon
101 South Main Avenue, Suite 100
Sioux Falls, SD 57104
Tel: (605) 338-4304
Fax: (605) 338-4162

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (*pro hac vice*)
Dane H. Butswinkas (*pro hac vice*)
Carl R. Metz (*pro hac vice*)
Stephen J. Fuzesi (*pro hac vice*)
725 Twelfth Street NW
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029

*Attorneys for Defendants American Broadcasting Companies, Inc.,
ABC News, Inc., Diane Sawyer, Jim Avila, and David Kerley*

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

I.      DEFENDANTS' MOTION APPLIES THE CORRECT STANDARD. ......................4

II.     THE UNDISPUTED FACT IS THAT BEEF PRODUCTS, INC. ALONE IS THE
        PRODUCER AND SELLER OF LFTB. ........................................................8

        A.      Beef Products, Inc. is the Only Producer and Seller of LFTB. ......................9

        B.      BPI Technology is an "Independent Contractor" that Provides Defined
                Services to Beef Products, Inc. Pursuant to Contract...................................13

        C.      Freezing Machines Merely Licenses Intellectual Property Used in the
                Design of Machinery. .......................................................................18

        D.      Plaintiffs Cannot Disregard the Corporate Formalities They Created.......18

III.    BPI TECHNOLOGY AND FREEZING MACHINES ARE NOT "REAL PARTIES
        IN INTEREST" ENTITLED TO ENFORCE THE RIGHTS ASSERTED IN THE
        COMPLAINT.................................................................................................21

        A.      BPI Technology and Freezing Machines Are Not "Producers" of LFTB
                Within the Meaning of the AFPDA.................................................21

        B.      BPI Technology and Freezing Machines Lack Enforceable Rights Sounding
                in Common Law Defamation, Disparagement or Tortious Interference....23

                1.      The ABC News Reports are Not "Of and Concerning" BPI
                        Technology and Freezing Machines...................................24

                2.      No Party Other than the Manufacturer of a Product May Sue for
                        Disparagement of that Product.........................................32

                3.      BPI Technology and Freezing Machines May Not Sue for Tortious
                        Interference. ...............................................................35

CONCLUSION .................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012) ...............................................38

*Benfield Inc. v. Aon Re, Inc.*, No. 07-cv-2218, 2008 WL 80610 (D. Minn. Jan. 8, 2008) .........38

*Block v. Toyota Motor Corp.*, 665 F.3d 944 (8th Cir. 2011) ...........................................................9

*Cardone v. Empire B.C.B.S.*, 884 F. Supp. 838 (S.D.N.Y. 1995) .........................................25, 27

*Cascades Dev. of Minn., LLC v. Nat'l Specialty Ins.*, 675 F.3d 1095 (8th Cir. 2012) ..............6, 8

*Charles Atlas Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150 (S.D.N.Y. 1983 .........................34

*Cutter v. Lincoln Nat'l Life Ins. Co.*, 794 F.2d 352 (8th Cir. 1986) ............................................36

*Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995) .................................................25

*Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 181
(E.D.N.Y. 1994) ....................................................................................................8, 20, 39, 40

*Elandia Int'l, Inc. v. Koy*, No. 09–20588, 2010 WL 2179770
(S.D. Fla. Feb. 22, 2010) ...............................................................................7, 8, 20, 39, 43

*Faiveley Transport USA v. Wabtec Corporation*, 2011 WL 1899730
(S.D.N.Y. May 13, 2011) ...........................................................................................................42

*Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136 (5th Cir. 1990) ...................................6

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) ...............................34

*Hawkman v. Parratt*, 661 F.2d 1161 (8th Cir. 1981) ...................................................................36

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) .......................................................................37

*Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400 (8th Cir. 1977) .....................4, 5, 6, 8

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035
(C.D. Cal. 1998) ...................................................................................................................34

*Jankovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007) .....................................25, 29, 35

*Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431 (8th Cir. 1994) ............................5

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ....................................6, 7, 37, 39, 42

*Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002 (8th Cir. 2006)............................................32

*Microsoft Corp. v. Zurich Am. Ins. Co.*, No. 00-521, 2001 WL 765871
    (W.D. Wash. July 2, 2001)............................................................................................28

*Mitchell v. Random House, Inc.*, 703 F. Supp. 1250 (S.D. Miss. 1988) ....................................28

*Provisional Government of the Republic of New Afrika v. Am. Broad. Cos.*,
    609 F. Supp. 104 (D.D.C. 1985) ..................................................................................27

*Reeder v. Carroll*, 759 F. Supp. 2d 1064 (N.D. Iowa 2010) ......................................................24

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) .....................................................................................35

*Seitz v. Rheem Mfg. Co.*, 544 F. Supp. 2d 901 (D. Ariz. 2008) .................................................34

*Simmons Ford v. Consumers Union*, 516 F. Supp. 742 (S.D.N.Y. 1981) ...................................33

*TVT Records v. Island Def Jam Music Group*, 279 F. Supp. 2d 366 (S.D.N.Y. 2003) ..............40

*Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990) ............................................................33

### STATE CASES

*Brodsky v. Journal Pub. Co.*, 42 N.W.2d 855 (S.D. 1950) ........................................................24

*Campbell v. Jewish Comm. for Pers. Serv.*, 271 P.2d 185 (Cal. App. Ct. 1954)....................7, 25

*Graceland College Ctr. for Prof'l Dev. and Lifelong Learning, Inc. v. South Dakota Dept.*
    *of Revenue*, 654 N.W.2d 779 (S.D. 2002) ...................................................................22

*Hagemann ex rel. Estate of Hagemann v. NJS Engg., Inc.*, 632 N.W.2d 840 (S.D. 2001) .........22

*Howsden v. Roper's Real Estate Co.*, 805 N.W.2d 640 (Neb. 2011)...........................................19

*Landstrom v. Shaver*, 561 N.W.2d 1 (S.D. 1997) ................................................................36, 40

*Rabenberg v. Rigney*, 597 N.W.2d 424 (S.D. 1999) ..................................................................22

*Tibke v. McDougall*, 479 N.W. 2d 898 (S.D. 1992)...................................................................36

*Von Sternberg v. Caffee*, 692 N.W.2d 549 (S.D. 2005) .............................................................21

*W. States Land & Cattle Co., Inc. v. Lexington Ins. Co.*, 459 N.W.2d 429 (S.D. 1990)............20

## OTHER AUTHORITIES

U.S. Constitution, 1st amend.....................................................................................passim

*Merriam-Webster's Collegiate Dictionary* (11th Ed. 2009) ..........................................22

Restatement (Second) of the Law of Torts § 623A, cmt. g.............................................27

Restatement (Second) of the Law of Torts, § 766 cmt. p.................................................37

SDCL 2-14-1 ....................................................................................................................22

SDCL 37-4A-1 ..................................................................................................................22

SDCL 40-32-2(14).............................................................................................................22

SDCL 45-9-2(12)...............................................................................................................22

SDCL 49-45-1.1(6)............................................................................................................22

SDCL 57A–2–103(1)(d) ....................................................................................................11

SDCL 57A-2-106(1)...........................................................................................................11

## INTRODUCTION

> Technology [BPI Technology, Inc.] and BPI [Beef Products, Inc.] are *independent contractors* and *nothing contained in this agreement shall be deemed to create an agency, franchise, joint venture, partnership or other relationship* between Technology and BPI for any purpose whatsoever and no relationship is intended or created hereby other than the relationship of independent contractors.

Defendants' Exhibit 1 ("Ex.1"), Admin. Svces. Agreement, ¶12 (emphasis added);

> Technology and BPI are *independent contractors* . . . . *Nothing in this Operating Agreement shall be deemed* to create a partnership relationship between Technology and BPI or *to make either jointly liable with the other* for any obligation arising out of the activities contemplated by this Operating Agreement.  Technology and BPI will each be solely responsible for the direction and control of the work of its own employees . . . .

Ex.2, Operating Agreement, ¶14 (emphasis added).

*          *          *          *          *

The owners of the three corporate plaintiffs in this case made a conscious decision to structure their affairs by segregating assets and liabilities into distinct corporations, tied together only by contracts placing them in the role of "independent contractors."  The Roth family, which owns all three companies, did not originally structure their operations that way.   However in 1997, after a string of E. coli outbreaks that spawned considerable litigation against others in the food industry, the Roths adopted a new corporate structure that placed all of their manufacturing facilities and operations into a Nebraska corporation (Beef Products, Inc.)—formally separating that company and its products from the company through which administrative services and technical support would be provided (BPI Technology, Inc.) and from the company

that would license intellectual property (Freezing Machines, Inc.).  There may have been many reasons for creating that separation, not the least of which was that it shielded BPI Technology and Freezing Machines from liability in the event the manufactured product harmed consumers.  In this litigation, however, plaintiffs are asserting the right to disregard the formalities of their corporate existence and treat all three entities as a *de facto* single enterprise.

These plaintiffs cannot have it both ways.  They cannot claim that they are separate entities for certain purposes and not for others.  BPI Technology and Freezing Machines cannot insulate themselves from legal responsibility for the safety of Lean Finely Textured Beef ("LFTB") and, at the same time, claim that they have the legal right to sue over statements that allegedly call the safety of LFTB into question.[1]

After all of the factual assertions offered in support of the motion to remand are sifted, what remains beyond dispute is this:  Beef Products, Inc. alone owns the factories in which LFTB is produced and the machinery used to produce LFTB; it alone employs the workers who operate the machinery; it alone owns the raw material used to make LFTB and the product that is produced; it alone contracts to sell that product to

---

[1] As noted previously, plaintiffs insist on using the abbreviation "BP" to refer to Beef Products, Inc., rather than the customary abbreviation "BPI," and on using "BPI" to refer to all three corporations together.  *See* Plaintiffs' Memorandum in Support of their Motion to Remand ("Pltfs.' Mem."), Dkt. # 61, at 1.  Those conventions necessarily result in confusion, because many of the plaintiffs' business records—including the contracts in place between them—define the term "BPI" to mean Beef Products, Inc. standing alone.  Rather than debate this collateral issue, the ABC Defendants have endeavored to minimize the confusion by using the plaintiffs' full names wherever possible, and "BPI" only when quoting a document that expressly defines that term as the abbreviation for the Nebraska corporation, Beef Products, Inc.

customers; and it alone has liability for any damage caused by the product.  *See infra* at 9-13.  In short, Beef Products, Inc. alone is the manufacturer or producer of LFTB.  The claim of BPI Technology and Freezing Machines to "producer" status ignores these critical facts.  It also disregards the unambiguous contract language that defines their roles. *See infra* at 13-18.  And it is inconsistent with the positions these companies have taken in other litigation involving LFTB, some of it occurring in this Court.

The reason why these plaintiffs struggle so to claim "producer" status is obvious: there is no precedent that permits anyone other than the manufacturer or producer of a product to bring a claim for product disparagement, either under the South Dakota statute or under the common law of any state.  In particular, there is no precedent that permits such a claim to be asserted by a company that licenses intellectual property to the producer or by a company that provides administrative services by contract to the producer.  Nor is there any precedent that permits a libel claim based on statements related to the quality or safety of a product to be brought by a party that merely contracts to provide intellectual property or administrative services to the producer. Certainly the plaintiffs have cited no such precedent.

Contrary to the arguments of BPI Technology and Freezing Machines, the issues presented by this motion are not factual issues for a jury or legal issues that must be decided by the South Dakota courts.  The necessary facts cannot meaningfully be disputed, and the relevant law is clearly established.  The dispositive question is whether BPI Technology and Freezing Machines are real parties in interest—whether they are parties who are "entitled to enforce the right[s] asserted" in the Complaint.

*Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977). Under the law of South Dakota and the U.S. Constitution, the answer is clearly no.

## I.   DEFENDANTS' MOTION APPLIES THE CORRECT STANDARD.

The ABC Defendants' position on the issues raised in the Motion to Remand was set forth in the Memorandum submitted in support of their Motion to Dismiss All Claims of Plaintiffs BPI Technology, Inc. and Freezing Machines, Inc. for Fraudulent Joinder and Failure to State a Claim. *See* Dkt. # 29. The ABC Defendants will not repeat those arguments in this Memorandum. Plaintiffs argue, however, that the ABC Defendants have conflated the standard for fraudulent joinder of a plaintiff with the standard for fraudulent joinder of a defendant, and that as a result all of their arguments may be disregarded as improper attempts to "evaluate whether [plaintiffs'] claims have a 'reasonable basis in fact and law.'" *See* Pltfs.' Mem., Dkt. # 61, at 14-18. That argument misreads the ABC Defendants' position.

As plaintiffs acknowledge, the applicable standard is the one cited throughout Defendants' Motion to Dismiss and in their Notice of Removal: a non-diverse plaintiff is fraudulently joined when it is not a "real party in interest" because it is not "the person who, under governing substantive law, is entitled to enforce the right asserted." *Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977); *see* Pltfs.' Mem. at 13 (same). The Motion to Dismiss correctly invokes that standard at least a dozen times, *see* ABC Defs.' Mem., Dkt. # 29 at 1-3, 8-10, 13-14, 20-21, 23, 25-26, explaining why Beef Products, Inc. alone is "entitled to enforce the right[s] asserted" in the Complaint. *Id.* at 10-13 (explaining why Beef Products, Inc. alone may sue for defamation); *id.* at 13-

4

14 (same for statutory claim); *id.* at 14-22 (same for common law product disparagement); *id.* at 23-26 (same for tortious interference).

Although plaintiffs eventually acknowledge the same standard that the ABC Defendants applied, they also suggest in several places a different standard. "A plaintiff is a real party in interest," they argue, "if he or she suffered an injury and stands to benefit from the successful prosecution of his or her claim." Pltfs.' Mem. at 1, 13. That is not correct: "The real party in interest is the party holding the right sought to be enforced, not necessarily the party who will ultimately benefit from recovery." *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 437-38 (8th Cir. 1994). Plaintiffs' alternative definition omits the essential requirement—acknowledged elsewhere in their papers, *see* Pltfs.' Mem. at 15—that to be a real party in interest, the plaintiff must ***own*** the legal rights at issue.[2]

The determination of whether the plaintiffs own the legal rights at issue— whether they are "the person[s] who, under governing substantive law, [are] entitled to enforce the right[s] asserted," *Iowa Pub. Serv. Co.*, 556 F.2d at 404—necessarily involves some analysis of their claims under the governing law. Thus, in *Cascades Dev. of Minn.*,

---

[2] Equally erroneous is plaintiffs' assertion that whether they are "real parties in interest" depends on whether they have a "'beneficial interest' in the litigation." Pltfs.' Mem. at 14 (emphasis added). That again ignores that the plaintiff must "own" the claim, not merely stand to benefit from it. *Johnson Int'l Co.*, 19 F.3d at 437-38; Pltfs.' Mem. at 15. The source of plaintiffs' erroneous definition is a misquotation of a passage in *Iowa Public Service* that relates to whether third-party beneficiaries have enforcement rights under Iowa contract law. 556 F.2d at 405-06. Plaintiffs arrived at their erroneous standard by substituting the phrase "in the litigation" where the Eighth Circuit had actually written "in the contract," thereby altering the meaning of the court's opinion.

*LLC v. Nat'l Specialty Ins.*, 675 F.3d 1095 (8th Cir. 2012), the court was asked to decide whether removal could be effected on diversity grounds, notwithstanding the presence of a non-diverse plaintiff who the defendants maintained was not a real party in interest. *Id.* at 1098. The issue turned on the validity, under Minnesota law, of a "gratuitous assignment" made by the original owner of the claim to the non-diverse plaintiff. *Id.* The Eighth Circuit addressed the issue by examining Minnesota law on the validity of gratuitous assignments, enabling it to determine whether the rights asserted in the lawsuit properly belonged to the non-diverse plaintiff. *Id.* at 1098-99. That analysis unquestionably involved an examination of the legal and factual basis on which the plaintiff claimed an entitlement to enforce the rights asserted in the complaint. As with this motion, it was proper for the court to conduct that inquiry in determining its jurisdiction.[3]

The issue of substantive law before the Court is ***not*** whether there is a valid claim of defamation, product disparagement or tortious interference, but whether, assuming a valid claim, these plaintiffs are the "person[s] who, under governing substantive law, [are] entitled to" assert it. In large measure, that question turns on the "of and concerning" rule, which "stands as a significant limitation ***on the universe of those who may seek a legal remedy*** for communications they think to be false and defamatory and to have injured them." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400

---

[3] Courts engage in similar inquiries in a wide range of contexts where a plaintiff's status as a "real party in interest" is challenged. *See, e.g., Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140-41 (5th Cir. 1990) (applying Louisiana contract law to determine if plaintiff was real party in interest); *see also* cases cited in Pltfs.' Mem. at 16 (same).

(2d Cir. 2006) (emphasis added).  Assessing whether BPI Technology and Freezing Machines belong in that universe does not require the Court to evaluate the merits of the underlying claims, just the identity of the party or parties entitled to assert those claims in light of the governing substantive law.  Thus, for example, in *Campbell v. Jewish Comm. for Pers. Serv.*, 271 P.2d 185 (Cal. Ct. App. 1954), the court held that plaintiff was not a real party in interest to a defamation claim, even though he claimed injury as a result of the defamatory statement, because the statement was only "of and concerning" the plaintiff's brother.  *Id.* at 187 ("Philip Cohen was the subject of the alleged defamatory letter, but it is James Campbell, his brother, who has brought the action. . . . Thus, the complaint discloses on its face that it is not brought by the real party in interest").

The question whether the plaintiff is a real party in interest to a tortious interference claim depends, among other things, upon whether the business relationship at issue belongs to the plaintiff or to someone else.  Thus, in *Elandia Int'l, Inc. v. Koy*, No. 09–20588, 2010 WL 2179770 (S.D. Fla. Feb. 22, 2010), the court applied substantive law to determine that the plaintiff was "not the real party in interest to assert [a] tortious interference claim."  *Id.* at *8.  The relevant relationship, the court explained, belonged to plaintiff's indirectly-owned subsidiary, making the plaintiff "legally a stranger to the [] transaction, despite the fact that it may very well have been substantially involved in the negotiation and closing of the deal."  *Id.* at *6 - *8.  *See also Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) (reviewing substantive law and holding that, notwithstanding a corporation's

7

independent financial injury, it was not a "real party in interest" to a tortious interference claim arising from a contract entered into by its sister corporation).

The relevant inquiry is thus not into the merits of the underlying claim, but only into the identity of the party or parties entitled to assert the claim in light of the governing substantive law. That is precisely the inquiry that the Eighth Circuit not only permits, but requires. *Iowa Pub. Serv. Co.*, 556 F.2d at 404; *Cascades Dev. of Minn.*, 675 F.3d at 1098-99.

## II.  THE UNDISPUTED FACT IS THAT BEEF PRODUCTS, INC. ALONE IS THE PRODUCER AND SELLER OF LFTB.

The Complaint sought to blur the distinctions among the plaintiffs by referring to them all as "BPI." As a result, it failed to articulate any basis on which BPI Technology and Freezing Machines could claim to be real parties in interest. Now the plaintiffs seek to save the claims of BPI Technology and Freezing Machines by introducing an affidavit and 28 new exhibits, which they say establish "three facts" establishing that they are real parties in interest:

> First, BP, BPI Tech, and FMI all produce and sell LFTB. Second, BP, BPI Tech, and FMI each had business relationships with grocery store chains and processors who sold ground beef made with LFTB. Third, BP, BPI Tech, and FMI are each closely associated with the production and sale of LFTB by individuals within and outside the beef industry.

Pltfs.' Mem. at 3-4.

These asserted "facts" do not survive scrutiny. The evidence that the plaintiffs themselves have submitted shows without question that LFTB is manufactured and sold by Beef Products, Inc. alone. Any role performed by BPI Technology is expressly

undertaken as an "independent contractor" providing logistical and technical "support services" for the manufacture and sale of "BPI's product." Ex.3 (Sales Comm'n Agreement) ¶¶1, 3a.[4]   And the only role performed by Freezing Machines is to license intellectual property to BPI Technology, which in turn sub-licenses that technology to Beef Products, Inc. so that it can build machines for use in its factories.  Ex.4 (Licensing Agreement).  Neither company has the status that it claims.

A.    **Beef Products, Inc. is the Only Producer and Seller of LFTB.**

Plaintiffs' Memorandum says little about Beef Products, Inc., except to concede that it is the corporation that is "'primarily responsible' for production and sale" of LFTB.  *See* Pltfs.' Mem. at 5.  That is an understatement.  Beef Products, Inc., alone owns the means of LFTB's production, it alone owns the raw materials and the resulting product, and it alone sells LFTB to customers.  These undisputed facts are evident both in the materials submitted by plaintiffs in this litigation and in materials submitted to other courts and regulatory authorities that the Court may consider in determining its jurisdiction.  *See Block v. Toyota Motor Corp.*, 665 F.3d 944, 948 (8th Cir. 2011) (courts may look beyond the allegations in the Complaint to determine if joinder of non-diverse party was fraudulent).

At the height of its production, LFTB was produced in four states:  Nebraska, Iowa, Kansas, and Texas.  *See* Compl. ¶368.  The factories at all four of those locations are owned by Beef Products, Inc.—not the other plaintiffs.  *See, e.g.*, Ex.2, Recital c.

---

[4]   Again, as noted in note 1, *supra*, the reference to "BPI" in these contracts is defined specifically and exclusively to mean "Beef Products, Inc., a Nebraska corporation."

Although all three corporations are ultimately owned by the same family, the corporations themselves have no parent-subsidiary relationship, *see* Dkt. # 65-67 (corporate disclosures), and no formal relationship of any kind "other than the relationship of independent contractors." Ex.1 ¶12; Ex.2 ¶13; Ex.3 ¶13. That corporate scheme was the result of a deliberate choice.

Prior to 1997, Beef Products, Inc. was a Delaware corporation that held both manufacturing and administrative functions inside one corporate entity. In February 1997, the Roth family made a decision to re-organize by incorporating a new Nebraska corporation bearing the name Beef Products, Inc., and changing the name of its existing Delaware corporation to BPI Technology, Inc. *See* Ex.5 (Letter to Nebraska Secretary of State). Upon its incorporation, the new entity became the owner of the manufacturing operations, including each of the factories in which LFTB is produced as well as the machinery used to produce it.[5] So complete was this transfer of responsibility that within three months BPI Technology formally ***withdrew its registration*** to conduct business in three of the four states where those factories are located. *See* Ex.6 (Certificates of Withdrawal). BPI Technology remains unauthorized to conduct business in those states to this day. *Id.* Concurrently, Beef Products, Inc. registered to do business in those states, specifying the nature of its business as "manufacturing."

---

[5] *See* Ex.2 Recital c (identifying "BPI" as the owner of each processing plant); *id.* ¶ 5 ("Any parts or equipment used by BPI in its operations, however, will be purchased directly by BPI."); *id.* ¶ 7 ("BPI agrees to provide machinery, tools, and equipment necessary for production of its Meat Products."); *see also* Ex.13 (identifying "Beef Products, Inc." as the owner of each factory); Ex.12 (same).

Ex.7.  BPI Technology also assigned to Beef Products, Inc. all of its ownership interest in the trademark "BPI" under which LFTB and the other manufactured products are sold. *See* Ex.8.   These are the essential facts that make Beef Products, Inc. the only true producer of LFTB.

Beef Products, Inc. is also the only entity that sells LFTB.  Plaintiffs broadly claim that all three plaintiffs "sell" the product, Pltfs.' Mem. at 3-4, but at best they are using that term in a colloquial sense rather than a legal one.  Plaintiffs do not claim that any party other than Beef Products, Inc., passes title of LFTB to the buyer—the legal definition of what it means to make a "sale."  *See* SDCL 57A-2-106(1) (defining "sale" under South Dakota Law as the "passing of title from the seller to the buyer for a price").  Nor do they claim that any party other than Beef Products, Inc. is a "seller" in the sense that it is the person that "contracts to sell goods." SDCL 57A–2–103(1)(d).  The only entity about whom such claims could possibly be made is Beef Products, Inc.—the party that has original title to LFTB and the party that contracts to transfer that title to customers.  Even the Complaint acknowledges this fact in various allegations.  *See* Compl. ¶329 (referring to "***BP's*** [Beef Products, Inc.'s] relationships" with customers); *id.* ¶¶376-77 (claiming that BPI Technology and Freezing Machines benefit from "***BP's sale*** of LFTB") (emphases added).

These facts are illustrated by past litigation between Beef Products, Inc. and various customers and suppliers.  When in the past a buyer of LFTB has failed to make payment, the party that sued to collect the receivable—the only party to do so—was Beef Products, Inc.  *See* Ex.9 (Complaint in *Beef Products, Inc. v. GFI Am., Inc.*).  As the

11

exhibits to the Complaint in that case show, the unpaid invoices were issued by Beef Products, Inc., because it was the seller of the product.  *Id.*

Similarly, when in the past a supplier was thought to have supplied contaminated raw materials causing damage to LFTB, the party that sued to redress that injury—the only party to do so—was Beef Products, Inc.  In one such case, Beef Products, Inc. sued ConAgra Beef Company, alleging that ConAgra had sold it beef trimmings (the raw material from which LFTB is created) that had to be recalled due to E. coli contamination.  *See* Ex.10 (Complaint in *Beef Products, Inc. v. ConAgra Beef Co.*).  In another, Beef Products, Inc. sued LaRoche, claiming that LaRoche had sold contaminated ammonia that had rendered some of its LFTB unfit for human consumption.  *See* Ex.11 (Complaint in *Beef Products, Inc. v. LaRoche Indus., Inc.*).  In both cases, Beef Products, Inc., acting alone as plaintiff, sought to recover damages for its inability to sell the contaminated product.

In none of these cases was there a suggestion that Beef Products, Inc. shared its rights as a producer or seller of LFTB with BPI Technology, Freezing Machines, or any other corporation.  To the contrary, in each case Beef Products, Inc.—and no one else— asserted the right to recover damages as the producer and seller of LFTB (or the equivalent product under other trade names). *See* Exs. 9, 10 & 11.   And this is true even though the *LaRoche* case was **removed** to this Court on the basis that complete diversity existed between the Nebraska corporation that produced LFTB and the Delaware corporation it sued for allegedly damaging that product.  *See* Ex.11 at p. 1 (Notice of Removal in *Beef Products, Inc. v. LaRoche*).  No suggestion was made in that case, as it

has been in this one, that the "producer" of LFTB was actually a network of corporations that could not be diverse from a Delaware defendant.[6]

**B.    BPI Technology is an "Independent Contractor" that Provides Defined Services to Beef Products, Inc. Pursuant to Contract.**

BPI Technology argues that it "is a producer [of LFTB] because it supervises nearly every aspect of LFTB production." Plfts.' Mem. at 5.  According to plaintiffs' declaration, BPI Technology is the party responsible for deciding how much LFTB to produce, when to produce it, who to sell the product to, and how much to sell it for.  *Id.*; *see also* Plfts.' Ex.A (Jochum Dec.) ¶¶19-20.  As explained below, that assertion is contradicted by the contracts between Beef Products, Inc. and BPI Technology, which expressly relegate BPI Technology to the role of an "independent contractor" providing defined services for a fee, all of which are performed "for the benefit of BPI" and "subject to BPI's approval." *See* Ex.1, preamble & ¶3; Ex.3, preamble & ¶3. Such a party cannot claim to be the "producer" of another company's product—and that, of course, is the reason why the corporations have been set up that way in the first place.

In February and March 1997, concurrent with the creation of the new Beef Products, Inc. as a Nebraska corporation, a series of contracts were executed between that company and the newly-renamed BPI Technology, Inc. *See* Exs. 1, 2, & 3.  Together, these contracts are the source of all of the rights and responsibilities existing between

---

[6] Other publicly-available documents confirm that when third-parties purchase LFTB or supply raw ingredients for its production, their contracts are entered into with Beef Products, Inc. alone.  One such contract, made public in an SEC filing, specifically provides that the agreement is not intended to provide any other person or entity with "any legal or equitable right, remedy or claim."  *See* Ex.12.

those two corporations, and they are unambiguous in defining the relationship between the two companies:

> Technology and [Beef Products, Inc. ("BPI")] are independent contractors and nothing contained in this agreement shall be deemed to create an agency, franchise, joint venture, partnership or other relationship between Technology and BPI *for any purpose whatsoever* and no relationship is intended or created hereby other than the relationship of independent contractors.

Ex.1 ¶12; *see also* Ex.3 ¶13 (same); Ex.2 ¶14 ("Technology and BPI are independent contractors, and neither is the legal representative or agent of the other for any purpose whatsoever").

Likewise, the agreements are unambiguous in defining the different functions of the two corporations, with each containing some variation of a preamble that describes Beef Products, Inc. as a company that "is in the business of manufacturing lean meat products . . . that are recovered from fresh meat trimmings," and BPI Technology as a company that is in the business of providing "support services" or technical advice. *See* Ex.3 (offering "sales and marketing support services in connection with the sale of products such as those manufactured by BPI"); Ex.1 ("administrative and support services").

Contrary to plaintiffs' assertions that BPI Technology has ultimate decision-making authority for a wide array of issues in connection with the production of LFTB, the agreements make clear that BPI Technology was engaged to perform discrete tasks, for a fee, and subject to the approval and control of Beef Products, Inc. *See, e.g.*, Ex.1 ¶3 ("Technology agrees to perform the following services and take the following actions on

14

behalf of BPI"); *id.* ¶6 ("Technology will use its best efforts to provide the services set forth in Section 3 of this Agreement in a manner reasonably acceptable to BPI. . . . Technology shall follow all reasonable guidelines, policies and procedures as may be established by BPI . . ."). The agreements, in fact, evidence a number of inaccuracies or exaggerations in plaintiffs' description of the parties' respective roles:

- Plaintiffs assert that "nearly all" of the Beef Products, Inc. employees involved in the production of LFTB "report to BPI Tech[nology]." Pltfs.' Mem. at 5. In fact, the relevant contract provides that each company is "solely responsible for the direction and control of the work of its own employees," Ex.2 ¶14;

- Plaintiffs assert that "BPI Tech[nology] decides how much LFTB to produce, [and] sets BPI's production hours." Pltfs' Mem. at 5. The relevant contract says that BPI Technology was contracted to "provide administrative support to assist BPI in the management of its inventory, including the scheduling of production." Ex.1 ¶3d;

- Plaintiffs assert that BPI Technology "decides which raw materials will be used for the production of LFTB." Pltfs' Mem. at 5. It does so for a fee, and subject to Beef Products, Inc.'s "right to refuse any Raw Materials that do not meet its specifications." Ex.2 ¶3e;

- Plaintiffs assert that BPI Technology "participates in setting the prices for the LFTB, [and] participates in deciding which customers BPI will sell to." Pltfs.' Mem. at 5-6. "Participates" is a carefully chosen word: by

15

contract, Beef Products, Inc. must "approve all sales prices and/or pricing formulas prior to acceptance of any orders," *see* Ex.3 ¶3c, and the work BPI Technology undertakes to develop customers is "subject to BPI's approval," *id.* ¶3g. Such activities must be performed "in a manner reasonably acceptable to BPI." *Id.* ¶7;

- Plaintiffs assert that BPI Technology "handles all billing and collection activities with customers." Pltfs.' Mem. at 6. Unstated is that it is paid a fee to support the collection of "accounts receivable owing to BPI," rather than to itself. Ex.1 ¶3f;

- Plaintiffs assert that BPI Technology had its own "relationships with grocery store chains and ground beef processors." Pltfs.' Mem. at 7. They fail to mention that those relationships exist exclusively to improve "sales prospects for BPI's products." *See* Ex.3 ¶3a;

- Finally, plaintiffs assert that BPI Technology "share[s] in the profits from LFTB sales." Pltfs.' Mem. at 12. To the contrary, it receives an "annual fee"—the "Operating Agreement Fee"—which is paid "[i]n consideration for all its services" to Beef Products, Inc. *See* Ex.2 ¶11a. While that fee is calculated on the basis of Beef Products, Inc.'s profits, the payment of that fee does not "create a partnership relationship between" the two companies. *Id.* ¶14.

Separate and apart from these specific examples, there are countless other tasks that are only undertaken by BPI Technology as "requested by BPI" or subject to the "approval of BPI." *See* Ex.1 ¶¶3a, 3e, 3g, & 6; Ex.3 ¶¶3g, 3h & 7.

Finally, language in the bodies of the agreements expressly reiterates that, regardless of the contractual services performed by BPI Technology, the "products" at issue in this case are produced and sold by Beef Products, Inc., not BPI Technology. *See* Ex.3; *id.* ¶3a ("Technology . . . shall devote its reasonable best efforts to the cultivation of markets and sales prospects for BPI's products"); *id.* ¶8 ("Products manufactured by BPI"); *see also* Ex.1 ¶7 (same); Ex.2 ¶7 ("BPI agrees to provide machinery, tools, and equipment . . . necessary for production of its Meat Products").

The purpose of structuring the relationship in this manner is unmistakable.  By making BPI Technology an "independent contractor" with defined responsibility for particular "administrative services" or "sales and marketing support services," the Roth family ensured that BPI Technology would not itself be liable for the safety of LFTB. That fact is written into the Operating Agreement, which provides:  "Nothing in this Operating Agreement shall be deemed . . . to make either jointly liable with the other for any obligation arising out of the activities contemplated by this Operating Agreement." Ex.2 ¶14; *see also* Ex.1 ¶7 ("BPI shall indemnify, defend and hold harmless Technology . . . from and against . . . any claim connected in any way with the Products manufactured by BPI"); Ex.3 ¶8 (same).  Liabilities arising from the "business of producing, distributing and selling . . . lean beef and pork meat products," rest—by design—with Beef Products, Inc. alone.  *Id.* Ex.2 at Recital b.

17

### C.   Freezing Machines Merely Licenses Intellectual Property Used in the Design of Machinery.

Even as BPI Technology stands well removed from the manufacture and sale of LFTB, its co-plaintiff Freezing Machines stands in another universe altogether.  Once again applying labels rather than facts, plaintiffs insist that Freezing Machines is both a "producer" and "seller" of LFTB.  But it does not, in fact, "produce" or "sell" LFTB at all.  The only specific commercial activity identified in plaintiffs' papers is that Freezing Machines develops and licenses technology used to manufacture machinery, which in turn is used in the production of meat products, including LFTB.  *See* Plfts.' Mem. at 6-8; Pltfs.' Ex.A ¶¶33-38.  The applicable licensing agreement was entered into between Freezing Machines and BPI Technology, and it is that company—not Beef Products, Inc.—that pays Freezing Machines its licensing fee.  *See* Ex.4 (Exclusive Licensing Agreement); *see also* Pltfs.' Ex.B ¶¶10-12 (same); Pltfs.' Mem. at 12 (same).  Any suggestion that Freezing Machines attains the status of a "producer" or "seller" of LFTB by licensing technology to a company that itself provides "support services" to the actual manufacturer and seller of LFTB is frivolous.

### D.   Plaintiffs Cannot Disregard the Corporate Formalities They Created.

Plaintiffs originally submitted their papers without attaching any of the contracts that define the relationship among them.  When the ABC Defendants asked to see a copy of the operative contracts, plaintiffs felt constrained to submit a supplemental declaration suggesting that the contracts, although never amended, are in some undescribed respect out of date.  *See* Dkt. # 63-1 (Supp. Jochum Dec.) ¶9 (asserting,

18

without elaboration, that the companies' "roles and responsibilities have evolved" since the contracts were signed).  The contracts, however, are entirely consistent with the three plaintiffs' separate corporate existence, and neither the contracts nor the plaintiffs' chosen corporate structure can be ignored for purposes of determining if they are real parties in interest.

A party simply cannot disregard the formalities of its corporate existence to support a short-term litigation strategy.  As recently explained by the Supreme Court of Nebraska, the state according to whose laws Beef Products, Inc. owes its existence:

> Many considerations may move a business entity to diversify its structure through the creation of other entities, but those considerations should include the obligations which arise as a consequence of such diversification.  One cannot claim the benefits of incorporation without the burdens.  ***So, when two companies are corporations which benefit from legally recognized identities separate and apart from one another, they must also bear the responsibility and liability of such separation.***

*Howsden v. Roper's Real Estate Co.*, 805 N.W.2d 640, 645 (Neb. 2011) (emphasis added). Put differently, "[w]here the directors and officers of one company decided to incorporate a separate company, whatever the motive, they become bound by the disadvantages as well as the advantages of separate incorporation."  *Elandia Int'l, Inc.*, 2010 WL 2179770, at *7; *see also Diesel Sys., Ltd.*, 861 F. Supp. at 181 (same).

Here, the "benefits" or "advantages" of plaintiffs' separate corporate existence are obvious:  by establishing distinct entities with no relationship of parent and subsidiary, no status as joint venturers or partners, indeed no relationship at all except that of "independent contractors," *see* Ex.1 ¶12, Ex.3 ¶13, the Roth family has effectively

insulated BPI Technology and Freezing Machines from any shared liability for injuries caused by the sale of LFTB.  That protection is of immense potential value to BPI Technology and Freezing Machines, as well as to the Roth family, whose exposure for any product liability claims is limited to the plants, equipment, and other manufacturing assets held by Beef Products, Inc.  The corresponding "burden" or "disadvantage" is that when a claim is asserted based on alleged damage caused to LFTB, the only party entitled to assert that claim is the entity that produces, owns and sells that product.  BPI Technology and Freezing Machines can no more *sue* as the producer of LFTB than they can *be sued* as its producer.

Plaintiffs cannot avoid the consequences of their chosen corporate structure by arguing, as they have, that the relationships between the companies have changed over time and are no longer accurately reflected in the contracts.  *See* Dkt. # 63-1 (Jochum Supp. Dec.) ¶¶9, 13.  For one thing, plaintiffs do not say what has changed about their relationships.  Their Complaint establishes that the essential facts of the relationships remain intact:  Beef Products, Inc. is the party engaged in the business of "preparing and selling LFTB," Compl. ¶25, while BPI Technology provides various "services" by contract, *id.* ¶26, and Freezing Machines licenses technology, *id.* ¶27.

Moreover, the contracts between these companies expressly provide that they "may not be waived, modified or amended unless pursuant to a signed writing executed by each of the parties hereto."  *Id.* Ex.1 ¶15; Ex.3 ¶16.  Plaintiffs admit that no such written modification or amendment has ever been executed, Dkt. # 63-1 (Jochum Supp. Dec.) ¶¶9, 13, which is dispositive of any attempt to claim a legal status other

20

than the one provided for in their agreements.  *See W. States Land & Cattle Co. v. Lexington Ins. Co.*, 459 N.W.2d 429, 434 (S.D. 1990) ("This court has long held that custom and practice is immaterial when a contract explicitly deals with the matter claimed to be the subject of custom and practice."); *Von Sternberg v. Caffee*, 692 N.W.2d 549, 553 (S.D. 2005) ("Because all the material provisions of the contract between plaintiffs and defendant were in writing, the alleged modification must also have been in writing").

## III. BPI TECHNOLOGY AND FREEZING MACHINES ARE NOT "REAL PARTIES IN INTEREST" ENTITLED TO ENFORCE THE RIGHTS ASSERTED IN THE COMPLAINT.

The facts set forth above cannot meaningfully be disputed and are dispositive of the legal issue before the Court.  BPI Technology and Freezing Machines are not entitled to assert the legal status of a producer or seller of LFTB.  As a result, they lack enforceable rights to assert any of the claims in the Complaint.

### A. BPI Technology and Freezing Machines Are Not "Producers" of LFTB Within the Meaning of the AFPDA.

For all of the above reasons, neither BPI Technology nor Freezing Machines is the "producer" of LFTB entitled to assert claims under the Agricultural Food Products Disparagement Act ("AFPDA").  Plaintiffs appear to agree that when the Legislature does not define a term—as it did not for the word "producer" in the AFPDA—courts should interpret that term consistently with its plain, ordinary meaning.  *See* SDCL 2-14-1 ("Words used are to be understood in their ordinary sense"); *Rabenberg v. Rigney*, 597 N.W.2d 424, 426 (S.D. 1999) ("When a statute's language is clear, certain and

unambiguous, our interpretation is confined to declaring its meaning as clearly expressed") (quotation omitted); *Hagemann ex rel. Estate of Hagemann v. NJS Engg., Inc.*, 632 N.W.2d 840, 843 (S.D. 2001) (effect must be given to "the plain, ordinary meaning of the language used by the legislature").

The plain and ordinary meaning of the term "producer" is "one that produces; especially:  one that grows agricultural products or manufactures crude materials into articles of use." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2009); *see also* Pltfs.' Mem. at 25 (citing definitions that include to "make or manufacture . . . from components or raw materials").[7]

These definitions cannot in any way be applied to BPI Technology, an "independent contractor" that provides discrete "support services" in aid of another company's production, or to Freezing Machines, a company that licenses intellectual property that is used to make machinery, which in turn is used to make a product.

---

[7] "Producer" is a word of such common and plain usage that it frequently goes undefined in South Dakota statutes, and when it is defined, it is because something about the statute in question creates a need to adopt a specialized meaning applicable to that statute alone.  *See, e.g.*, SDCL 45-9-2(12) (defining "producer" for purposes of an oil and gas conservation statute); SDCL 40-32-2(14) (defining "producer" for purposes of dairy regulation); SDCL 49-45-1.1(6) (defining "producer" for purposes of grain production).  Plaintiffs' assertion that the Court should eschew the plain, ordinary meaning of "producer" in favor of a specialized definition in a different statute governing disputes over sales contracts, *see* Pltfs.' Mem. at 26 (citing SDCL 37-4A-1), ignores the different context of that statute, and is inconsistent with the axiom that "[w]ords used by the legislature are presumed to convey their ordinary, popular meaning, unless the context or the legislature's apparent intention justifies departure." *Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc. v. S.D. Dep't. of Revenue*, 654 N.W.2d 779, 783, (S.D. 2002).  BPI Technology and Freezing Machines cannot, in any case, meet that definition of "producer" for the reasons discussed in this section.

*Supra* at 13-19.  Freezing Machines' connection to LFTB is through a licensing agreement existing between itself and BPI Technology; and BPI Technology is no longer even registered to do business in three of the four states in which LFTB is produced.  *See* Ex.4 (Licensing Agreement), Ex.6 (Certificates of Withdrawal).  Because the plain and ordinary meaning of the term "producer" does not embrace corporations as remote from the means of production as these, they lack enforceable rights under the statute.

> **B.    BPI Technology and Freezing Machines Lack Enforceable Rights Sounding in Common Law Defamation, Disparagement or Tortious Interference.**

BPI Technology and Freezing Machines are no more entitled to enforce the common law claims asserted in the Complaint than they are to enforce the statutory claims.

The underlying legal principles are well-established:  (1) related companies may not, consistently with the First Amendment, sue for defamation of another company in the same family, even if they have an independent injury, *see infra* at 25, 29 & cases cited in ABC Defs.' Mem. at 10-12; (2) only the producer of a product may sue for product disparagement, even if another related company suffers economic injury, *see infra* at 33-35 & cases cited in ABC Defs.' Mem. at 15-18; and (3) only the party who has a direct business relationship with a third-party may sue for the tortious interference of that relationship, even if another related company suffers economic injury, *see infra* at 36-40 & cases cited in ABC Defs.' Mem. at 23-25.  Contrary to plaintiffs' arguments, the application of those principles to each of plaintiffs' claims is neither a question of fact for the jury to resolve, nor a disputed question of state law reserved for the courts of

South Dakota.  The undisputed facts and clearly-established law compel the conclusion that BPI Technology and Freezing Machines are not the real parties in interest to any claim.

> ### 1.   The ABC News Reports are Not "Of and Concerning" BPI Technology and Freezing Machines.

Plaintiffs assert that the question whether the ABC News reports refer to BPI Technology or Freezing Machines is a question of fact that can only be answered by the jury.  Pltfs.' Mem. at 23-24.  That is not the law.  While there can exist in some cases a factual question whether a statement in fact refers to a particular plaintiff, the  threshold issue of whether that statement could "reasonably be understood to be of and concerning" the plaintiff is an issue for the Court to decide "as a matter of law" based upon its review of the relevant statements.  *Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1083 (N.D. Iowa 2010).  *See also, e.g., Brodsky v. Journal Pub. Co.*, 42 N.W.2d 855, 857 (S.D. 1950) (disagreeing with plaintiff's "conten[tion] that it was for the jury to determine whether or not the published article had reference to him"); *Kirch*, 449 F.3d at 391, 398 (affirming dismissal of defamation claim and determining that statements about the KirchGroup were not "of and concerning" a related corporation "known in the industry as the 'face' of the KirchGroup in North America"); *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (holding as a matter of law that statements about a bank and its foreign owner, were not "of and concerning" other corporations owned by the same person); *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1349 (7th Cir. 1995) (whether audience would be likely to think that defendant referred to plaintiff is a question of law to be

decided by judge and subject to plenary appellate review); *Cardone v. Empire B.C.B.S.*, 884 F. Supp. 838, 847 (S.D.N.Y. 1995) ("[W]hether the complaint alleges facts sufficient to demonstrate a reasonable connection between the [plaintiff] and the alleged libel is a question for the court").

It is entirely appropriate, therefore, for this Court to review the alleged statements and determine whether they are reasonably susceptible to an interpretation that refers to BPI Technology or Freezing Machines.  Indeed, it is necessary to do so to determine whether those companies, in addition to Beef Products, Inc., can claim the status of real parties in interest.  *See, e.g., Campbell*, 271 P.2d at 187.

Plaintiffs' contention that the ABC News reports are "of and concerning" BPI Technology and Freezing Machines is based not on any actual reference to them in the reports, but upon an assertion that wherever the reports refer to the "maker" or "producer" of LFTB, they are necessarily referring to all three of the plaintiff corporations.  *See* Plfts.' Mem. at 19-23.  This circular logic fails for exactly the reason discussed above:  BPI Technology and Freezing Machines are ***not*** the producers of LFTB, and there is no evidence suggesting that they are.  Inasmuch as they concede that the ABC News reports make no direct reference to those corporations, *id.* at 20 (". . . Defendants did not name BPI Tech and FMI in their publications . . ."), the groundless claim that they are the producers of LFTB cannot be used to transform reports about LFTB and the company that actually produces it into reports about these other plaintiffs.

25

The reports were not at all ambiguous about which company was being referred to as the "maker" of LFTB.  *See* Pltfs.' Mem. at 23.  The reports (copies of which are attached as Exhibits to plaintiffs' Complaint) did not use that term in isolation, but instead directly and consistently identified the "maker" of LFTB as Beef Products, Inc.:

- Compl. Ex.2 (3/7/12 World News):  "Beef Products Inc., the makers of pink slime"

- Compl. Ex.13 (3/7/12 Online Report):  "Beef Products Inc., the makers of pink slime"

- Compl. Ex.15 (3/9/12 Online Report):  "before Beef Products Inc. found a way to use it"

- Compl. Ex.16 (3/14/12 Online Report):  "Beef Products Inc., the company that makes 'pink slime'"

- Compl. Ex.10 (3/26/12 World News):  "Beef Products, Inc, its maker, came out swinging today"

- Compl. Ex.22 (3/26/12 Online Report):  "Beef Products, Inc, the makers of 'lean finely textured beef,' a product now known by the critics term for it, 'pink slime,' came out swinging today"

- Compl. Ex.23 (3/27/12 Online Report):  "Beef Products Inc., maker of the ground beef filler USDA scientists nicknamed 'pink slime,' plans to launch a consumer education program"

- Compl. Ex.11 (3/29/12 World News):  "Beef Products Inc calls it lean finely textured beef"

- Compl. Ex.24 (3/29/12 Online Report):  "Beef Products Inc., the company that makes lean finely textured beef"

Similarly, all of the visual references to the producer of LFTB in ABC News' reports were references to "Beef Products, Inc."  *See* Ex.14 (screenshots of broadcasts).

In the face of these multiple express identifications of Beef Products, Inc. as the company whose product was at issue, there is simply no room to argue that the reports

26

were "of and concerning" any other company.  *See, e.g., Cardone*, 884 F. Supp. at 847 (statements could not reasonably be read as referring to plaintiff when they "never mentioned [plaintiff]'s name" even as they "conspicuous[ly]" mentioned others by name).  In fact, as we have argued separately, the reports were about a product, not about the maker of the product.  *See* Dkt. #36, at 41-45.[8]  But if they were about the maker, they were about the only company identified as the maker, Beef Products, Inc.

Plaintiffs argue that "BPI Tech's and FMI's roles with respect to the production and sale of LFTB were widely known and well publicized," and that "third parties familiar with" their roles would have reasonably understood the articles to be about them.  Pltfs.' Mem. at 7-8, 20.  But a third party "familiar with" BPI Technology's role would have known it is "in the business of providing sales and marketing support services" as well as "administrative and support services"—not the business of manufacturing LFTB.  *See* Ex.15 (contract between National Beef Packing, Co. and "Beef Products, Inc. ('BPI') a Nebraska corporation"; contract identifies "BPI" as engaged in the "business of producing, distributing, and selling lean beef, pork, and other meat products" and separately identifies BPI Technology as a non-party "that is engaged in the business of providing technological and manufacturing support services").  No part of the ABC News reports can possibly—let alone reasonably—be construed as bearing upon the quality or nature of the services provided by BPI Technology.  Likewise, a

---

[8] "If the statement reflects merely upon the quality of what the plaintiff has to sell or solely on the character of his business," the cause of action is for product disparagement, not defamation. Restatement (Second) of the Law of Torts § 623A, cmt. g.

third party "familiar with" Freezing Machines' role would know that it merely licensed intellectual property. *Id.* Ex.15 (identifying Freezing Machines as a "technology company that develops equipment and processes for producing meat products" and licenses that technology to others). No part of the ABC News reports can even remotely be construed as bearing upon the validity of that intellectual property, or the manner in which it had been licensed. In short, neither corporation can claim that its actual role in the production of LFTB—as opposed to the aggrandized version it has claimed for itself—is remotely implicated by the reports.

Falling short of actual "producer" status, BPI Technology and Freezing Machines repeatedly assert that they are "closely associated" with the production of LFTB. *See* Pltfs.' Mem. at 2, 5, 7, 21. But that is no answer. "Allegations of defamation by an organization and its members are not interchangeable." *Provisional Government of the Republic of New Afrika v. Am. Broad. Cos.,* 609 F. Supp. 104, 108 (D.D.C. 1985). "Statements which refer to individual members of an organization do not implicate the organization." *Id.* For that reason, to claim a "close association" to the subject of an allegedly defamatory report—even to claim that one is "known in the industry as the 'face' of the" subject corporation—is legally insufficient. *Kirch,* 449 F.3d at 391, 398; *see also, e.g., Mitchell v. Random House, Inc.,* 703 F. Supp. 1250, 1256 (S.D. Miss. 1988) ("[W]hile there will necessarily be persons such as spouses and other close relatives of a person libeled who will experience its impact, 'the libel is not actionable by them unless it can be shown that the libel in question was published of and concerning them.'" (citation omitted)), *aff'd,* 865 F.2d 664 (5th Cir. 1989). As a matter of law, statements that

refer only to "Beef Products, Inc." do not implicate others with whom it is "closely associated."

It is irrelevant that BPI Technology's name has appeared in promotional materials prepared by the plaintiffs. The promotional materials themselves consistently state that "*Beef Products, Inc*. is the leading manufacturer of boneless lean beef in the world." *See* Pltfs.' Ex.A5 (emphasis added); *see also* Pltfs.' Ex.A7 (same); Pltfs.' Ex.A9 (same). It is also irrelevant that trade magazines have referred to "BPI Technology, Inc.," instead of "Beef Products, Inc.," in industry rankings. Pltfs.' Mem. at 8. All that is known about how those lists were compiled is that the "[c]ompany information [was] self-reported via survey." Pltfs.' Ex.A13. The fact that these companies chose, for whatever reason, to list BPI Technology's name on a survey response says nothing about how others would interpret news reports that refer exclusively to "Beef Products, Inc." and no other company as the "maker" of LFTB.

Plaintiffs argue that BPI Technology was indirectly referred to as having engaged in wrong-doing in securing approval from the USDA. *See* Pltfs.' Mem. at 22. But that argument ignores the clear language of the report in question. For one thing, the report cannot be read as alleging wrongdoing by anyone—it expressly says that no wrongdoing occurred under the rules in place at the time. *See* Compl. Ex.2 (3/7/2012 World News). But even if the report could have been read to imply wrongdoing by someone, it cannot reasonably be read as accusing BPI Technology of wrongdoing. The report refers to three parties: Joanne Smith, a former USDA official; an unnamed "principal supplier" of Beef Products, Inc. whose board she joined; and Beef Products,

29

Inc.[9]  To the extent this report can reasonably be construed as containing defamatory remarks about anyone, it would be the USDA official or the "principal supplier," not an unnamed company that would one day become an "independent contractor" of the third corporation mentioned in that paragraph.  *See, e.g., Jankovic*, 494 F.3d at 1089-90 (affirming dismissal of defamation claim because "it cannot be the case that a reasonable reader" would connect the plaintiff personally to statements about a company that bore his name).

Finally, in support of their motion, plaintiffs assert that "[t]he Complaint identifies various third parties who reasonably understood that Defendants' publications were of and concerning BPI Tech and FMI."  Pltfs.' Mem. at 21.  That statement is simply wrong.  The Complaint does not identify ***anyone*** who understood the reports that way.[10]  To the contrary, it attaches exhibits showing that third-parties uniformly and reasonably understood the reports as referring to Beef Products, Inc.  *See, e.g.*, Compl. Ex.76 (American Meat Institute referring to "Beef Products, Inc." as the producer of LFTB in response to ABC News reports); Compl. Ex.81 (food safety advocate responding to reports about "lean beef trim produced by Beef Products, Inc.");

---

[9] Plaintiffs assert that "BPI Tech obtained approval from the USDA in 1991 and 1993" to call the product LFTB and to include it in ground beef.  Pltfs. Mem. 8.  In 1991 and 1993, however, there was no company called "BPI Technology," only a company named Beef Products, Inc.  *See* Ex.5.  It was not until 1997, years after the USDA's approvals, that BPI Technology came to exist under that name.  *Id.*

[10] The only citations that accompany this statement are to other pages in the plaintiffs' memorandum, which in turn purport to identify services BPI Technology and Freezing Machines provided, not "third parties who . . . understood that Defendants' publications [to be] of and concerning BPI Tech and FMI."

Compl. Ex.82 (Iowa State professor defending the ammonia treatment "process that was developed by Beef Products, Inc."); Compl. Ex.85 (Consumer Federation of America identifying "Beef Products, Inc." as embroiled in a "controversy over lean finely textured beef"); Compl. Ex.86 (National Consumers League claiming that "Beef Products, Inc." had been harmed by "misinformation, widely disseminated by the media, about its product"); Compl. Ex.90 (Texas A&M professor "writing at the request of Beef Products, Inc." in response to the ABC News reports); Compl. Ex.100 (transcript of Congressman Huelskamp's remarks entitled "Frustration with ABC News Reporting on Beef Products, Inc."); Compl. Ex.102 (letter from Members of Congress claiming that "misinformation has been disseminated to the public regarding the high-quality lean, finely textured beef that is produced by companies like Beef Products Incorporated").

*Not one* of these third-parties referred to BPI Technology or Freezing Machines as having been the subject of the ABC News reports.  Nor, of course, did the companies' lawyers make any such claim until just days before the Complaint was filed—months after the original reporting took place.  Like the various industry trade organizations, the plaintiffs' lawyers' contemporaneous reactions referred only to "Beef Products, Inc." and not the other two plaintiffs, as the subject of the reports.  *See* Compl. Exs. 58, 60 & 62.   Indeed, when Eldon Roth—the founder and President of all three plaintiff corporations—issued statements denouncing the ABC News reports, he did so on behalf of just one of those companies—Beef Products, Inc.  *See* Compl. Ex.71, Compl. Ex.74.

All of these individuals and entities—company insiders, industry members, academics, government officials, and even plaintiffs' own lawyers—interpreted the ABC News reports the same way for a reason:  that is the only way they are reasonably susceptible of being interpreted.

>    **2.    No Party Other than the Manufacturer of a Product May Sue for Disparagement of that Product.**

Plaintiffs invite the Court to speculate that a South Dakota court "might" permit a party other than the manufacturer to sue for product disparagement.  In support of that invitation, plaintiffs insist that "there is no precedent under South Dakota law to support the . . . arguments that only producers or manufacturers can bring common-law disparagement claims."  Pltfs.' Mem. at 28.  It would be more accurate to say there is no precedent inside or outside South Dakota to suggest that anyone else can bring such a claim.  In support of their Motion to Dismiss, the ABC Defendants identified cases from courts across the United States uniformly requiring that a product disparagement suit be brought by the party whose product is at issue.  *See* ABC Defs.' Mem. at 15-18. Plaintiffs assert that two of these cases are "irrelevant because they involved vastly different facts," Pltfs.' Mem. at 28, but nowhere do they muster any authority of their own to suggest that the principles applied in those cases (and the other cases cited by the ABC Defendants) are the least bit controversial.  Certainly, plaintiffs cite no example of a court that has actually considered the issue and reached the conclusion they are

urging.[11]  That alone is dispositive of any suggestion that this Court should remand the case out of deference to the possibility that a South Dakota court "might" reach a conclusion that no other state or federal court has previously reached.  *See Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1004–05 (8th Cir. 2006) (explaining that, because "no jurisdiction has expanded [the relevant] duty" as far as the plaintiffs' claim would require, it was "unreasonable to believe Missouri would impose such a duty" on defendants).

Any suggestion that the South Dakota courts "might" expand the category of plaintiffs entitled to enforce the right asserted here is further undermined by two additional considerations.  First, as explained above, BPI Technology and Freezing Machines have been purposefully insulated from responsibility for the safety of LFTB.  *Supra* at 18.  Under these circumstances, there is no reason why a court should be inclined to let them sue for statements that allegedly call the safety of that product into question.  Just as liability caused *by* LFTB is a matter for Beef Products, Inc. alone, so too is the right to recover for damage caused *to* that product.

---

[11] The two decisions cited by plaintiffs included claims brought by the manufacturer of the product in question.  In *Charles Atlas Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150 (S.D.N.Y. 1983) (Pltfs.' Mem. at 28), the plaintiff was not simply a "marketer of an exercise regimen" as plaintiffs claim, but the manufacturer and retailer of exercise equipment that it claimed had been disparaged by a spoof of a famous advertisement for the equipment.  *Id.* at 153.  In *Seitz v. Rheem Mfg. Co.*, 544 F. Supp. 2d 901 (D. Ariz. 2008) (Pltfs.' Mem. at 28), plaintiffs were both the corporate manufacturer of a water heater and an individual who both invented the product and served as president of the company.  *Id.* at 909.  There is no indication that the defendants raised a question about the individual plaintiff's right to sue alongside the manufacturer, and as a result the court's opinion is silent on the issue.  It is telling that these are the only authorities plaintiffs could muster in support of their position.

Second, and even more fundamentally, this is not just an issue of state tort law, but one of federal constitutional law.  The "of and concerning" requirement exists by operation of the First Amendment, *Rosenblatt v. Baer*, 383 U.S. 75, 81–82 (1966), and "claims for product disparagement, or 'trade libel,' . . . are subject to the same First Amendment requirements that govern actions for defamation."  *See, e.g., Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990); *see also* ABC Defs.' Mem. at 15-16 (citing additional authority).  The question whether this constitutional requirement allows recovery by someone other than the producer of a product is a question for this Court to decide under federal law.  *See Microsoft Corp. v. Zurich Am. Ins. Co.*, No. 00-521, 2001 WL 765871, at *6 (W.D. Wash. July 2, 2001) (applying the "well-established principle of ***First Amendment jurisprudence*** that the injured party in an action for product disparagement must establish that the disparaging communication was personally directed to his or her product") (emphasis added); *Simmons Ford v. Consumers Union*, 516 F. Supp. 742, 751 (S.D.N.Y. 1981) (holding that, under the First Amendment, only the manufacturer may sue for product disparagement).  Plaintiffs have given this Court no reason why its analysis of that constitutional question should differ from that of these other courts—and no reason why it should leave this issue of federal law to a state court.  *See Hawkman v. Parratt*, 661 F.2d 1161, 1166 (8th Cir. 1981) (federal courts should not defer to state court interpretations of federal law).[12]

---

[12] Certainly, plaintiffs do not give such a reason with their incoherent suggestion that the "of and concerning" requirement is inapplicable to claims alleging false and defamatory speech.  Pltfs.' Mem. at 29.  In *every* case where the "of and concerning"

For each of these reasons, BPI Technology and Freezing Machines are not the real parties in interest to a claim for defamation or common law product disparagement.

### 3.    BPI Technology and Freezing Machines May Not Sue for Tortious Interference.

BPI Technology and Freezing Machines are not the real parties in interest to the asserted tortious interference claim for two reasons:  first, because to allow a tortious interference claim by these companies would be to enable them to circumvent the First Amendment protections applicable to allegedly defamatory or disparaging statements; and second, because a third party may not assert a claim for tortious interference with the business relationships of another in any event.

As to the first of these principles, plaintiffs again rely on the paucity of on-point South Dakota law to assert that a state court might reach a different conclusion.  *See* Pltfs.' Mem. at 36.  But as before, this is a question that is controlled by federal law as much as by state law:  "First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement." *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1044 (C.D. Cal. 1998) (dismissing tortious interference claim); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (a plaintiff may not "avoid the First Amendment limitations on defamation claims by seeking publication damages under

---

rule is applied, the plaintiff has made an allegation that the defendant's speech was false and defamatory.  Nevertheless, the rule applies.  *Kirch*, 449 F.3d at 399-400.

non-reputational tort claims, while holding to the normal state law proof standards for these torts") (citing *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988)).

Plaintiffs cite a footnote from *Beverly Hills Foodland, Inc. v. United Food & Comm. Workers Union* noting that "[t]here may be circumstances where a defamation claim could fail and yet a tortious interference claim could succeed." 39 F.3d 191, 196 n.8 (8th Cir. 1994). Pltfs.' Mem. at 36. While that is true insofar as it goes—a plaintiff, for example, might complain of tortious interference that does not involve defamatory speech—the Eighth Circuit made it unambiguously clear that "creative pleading" cannot be a basis to circumvent the protections of the First Amendment. *Beverly Hills Foodland*, 39 F.3d at 196. Thus, as the D.C. Circuit explained in *Jankovic*, when a plaintiff's defamation claim fails on "of and concerning" grounds, so too must claims for tortious interference and invasion of privacy that are "rooted in the same alleged defamatory conduct." 494 F.3d at 1092. "[S]tatements not concerning a plaintiff do not affront privacy rights or business expectancies." *Id.*

That is precisely the case here: the reason BPI Technology and Freezing Machines are unable to assert claims for defamation and disparagement is that they cannot meet the "of and concerning" requirement that "stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory and to have injured them." *Kirch*, 449 F.3d 399-400 (emphasis added). They cannot evade that constitutional limitation simply by re-pleading claims arising from the same conduct under a different label.

36

Second, even apart from the "of and concerning" requirement that applies when a claim is based on defamatory or disparaging speech, the law of tortious interference itself limits such claims to interference with the plaintiff's own business relationships. Under settled South Dakota law, a cognizable tortious interference claim requires a "triangle"—*i.e.*, "a plaintiff, an identifiable third party who wished to deal ***with the plaintiff***, and the defendant who interfered ***with the plaintiff and the third party***." *Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D. 1997) (emphasis added). As *Landstrom* makes clear, the business relationship that forms the basis of the tortious interference claim must be the ***plaintiff's*** business relationship. *Id.* Indeed, the South Dakota Supreme Court has made the point explicitly: "Liability for tortious interference with a business relationship can be asserted only by those directly connected with the contract or relationship on which the alleged tortious interference was immediately operative." *Tibke v. McDougall*, 479 N.W. 2d 898, 909 (S.D. 1992).

That point is also made clear by the Restatement provision on tortious interference—which supplies the basis for South Dakota's law on the subject. *See Cutter v. Lincoln Nat'l Life Ins. Co.*, 794 F.2d 352, 356 (8th Cir. 1986). In the portion of the Restatement commentary defining "[t]he person protected" by the tort, the Restatement explains:

> [I]f A induces B to break a contract with C, persons other than C who may be harmed by the action as, for example, his employees or suppliers, are not within the scope of the protection afforded by this rule, unless A intends to affect them. Even then they may not be able to recover unless A acted for the purpose of interfering with their contracts.

Restatement (Second) of the Law of Torts, § 766 cmt. p.  In short, the only person protected by this tort—the only one "entitled to enforce the right" asserted—is the entity directly connected to the allegedly interfered-with relationship.

Consistent with this principle, courts across the country routinely dismiss tortious interference claims where, as here, a plaintiff seeks to invoke the business relationship of someone else as the basis for his claims.  Thus, for example, in *Kirch*, the court dismissed such a claim pursuant to the "well-settled" rule that "agents or brokers cannot recover on the basis of interference with the transactions or business relationships for which they are serving as agent or broker."  449 F.3d at 400-01.  That the broker had a role in negotiating the affected contracts, and lost "virtually its entire business" when they fell through, did not invest it with any rights.  *Id.*

Plaintiffs cite language in the *Kirch* opinion noting that the plaintiff was not owned by the company for which it served as agent and did not share senior management.  Pltfs.' Mem. at 33.  But neither common ownership nor common officers is a basis for disregarding separate corporate existence.  In *Elandia*, for example, the plaintiff corporation was "substantially involved in the negotiation and closing" of a transaction entered into by its indirectly-owned subsidiary.  2010 WL 2179770, at *8.  Since only the subsidiary "possessed [the relevant] business relationship," the controlling parent was "legally a stranger to the . . . transaction" and "not the real party in interest to assert [a] tortious interference claim" arising from it.  *Id.*  And in *Diesel*, the court held that the plaintiff was not the real party in interest to a claim that the defendants had tortiously interfered with agreements of the plaintiff's sister corporation

to sell generators in China.  861 F. Supp. at 180.  "A corporation does not have standing to assert claims belonging to a related corporation," the court explained, "simply because their business is intertwined."  *Id.* at 181.  In language fully applicable here, the court elaborated:  "once the directors and officers of [the plaintiff corporation] decided to incorporate [its sister corporation], whatever their motive, they became 'bound by the disadvantages as well as the advantages of separate incorporation.'"  *Id.*[13]

BPI Technology and Freezing Machines are not real parties in interest because they cannot establish that they, as opposed to Beef Products, Inc., had any business relationship that was the subject of interference.  Plaintiffs assert that these companies "worked with grocery store chains and processors to demonstrate that they should use LFTB in their ground beef," "reasonably expected those business relationships to continue into the future," "profit[ed] from the sales of LFTB generated by those relationships," and (at least in the case of BPI Technology) "played [an important role] in maintaining and developing those relationships."  Pltfs.' Mem., at 32.  To the extent they performed those roles, however, they did so pursuant to a "sales and marketing support services" agreement entered into "*for the benefit of BPI*." Ex.3, preamble.  BPI Technology did not form its own relationships with grocery stores to support the sale of

---

[13] *See also, e.g.*, *Benfield, Inc. v. Aon Re, Inc.*, No. 07-cv-2218, 2008 WL 80610, at *2-3 (D. Minn. Jan. 8, 2008) (party that negotiated contracts as a broker not permitted to sue for tortious interference since it was not a party to any of the agreements; the fact that plaintiff was entitled to receive a commission under the contracts did not give it ownership of a tortious interference claim); *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) (individual member of limited liability company not permitted to sue for interference with company's contract).

its own product; it agreed by contract to "devote its reasonable best efforts to the cultivation of markets and sales prospects *for BPI's* products." *Id.* Ex.3 ¶3a.  It did not market its own products to those stores; it agreed to create "promotional materials as may be reasonably necessary *for BPI's business development*, all of which shall be subject to BPI's approval." *Id.* ¶3g.  It did not maintain relationships with its own customers; it fulfilled a contractual responsibility to "engage in communications with *BPI's existing customers* and encourage the placing of further orders by such customers." *Id.* ¶3f.

Each of those roles was performed not as an agent, partner, or joint venturer in the sale of LFTB, but solely as an "independent contractor" that had agreed to provide these "support services" in exchange for a "commission."   *See* Ex.3 ¶¶1, 4.  If an agent or broker is not sufficiently directly connected with the contract or relationship of his principal, neither is an independent contractor like BPI Technology that has expressly disavowed any agency relationship.  *Id.* ¶13 ("nothing contained in this Agreement shall be deemed to create an agency. . ."); *see also* Ex.1 ¶12 (same). Put differently, plaintiffs may not turn the "triangle" of permissible tortious interference claims into a square. *Landstrom*, 561 N.W.2d at 16.

It should be unsurprising, given the foregoing, that plaintiffs find no quarter in the cases they cite on this point.  As previously explained, the first case they cite, *Kirch*, 449 F.3d at 401, does not help them: *Kirsch* **rejected** a tortious interference claim brought by an entity alleging to be the "face" and "exclusive agent" of the entity actually possessing the relevant business relationship, on the ground that any injury suffered by

the plaintiff was merely "derivative" of the injury suffered by the party with the direct business relationship and was therefore "too attenuated" to support a tortious interference claim.  *Id*.  No better for plaintiffs is *TVT Records v. Island Def Jam Music Group*, 279 F. Supp. 2d 366, 383–84 (S.D.N.Y. 2003).  That case permitted a plaintiff that possessed a right to sue directly under the contract at issue as "an intended third-party beneficiary" of the contract, *see id*., at 384, to sue for tortious interference, *id*. at 383–84.  Because the plaintiff there, unlike the plaintiffs here, possessed rights directly enforceable under the contract that was interfered with, that plaintiff was part of the "triangle" necessary to state a cognizable tortious interference claim, *see Landstrom*, 561 N.W.2d at 16.  Nor can plaintiffs draw support from *Faiveley Transport USA v. Wabtec Corporation*, 2011 WL 1899730 (S.D.N.Y. May 13, 2011), which addressed tortious interference claims brought by manufacturers of a product for injuries caused by the disruption of relationships formed to sell ***their*** products for their "direct pecuniary benefi[t]."  *Id*. at *9.  The equivalent plaintiff in this case is Beef Products, Inc., which is suing over the disruption of relationships that exist for the sale of its product.  *Supra* at 11-13, 15-17.  The "independent contractor" and licensor of technology who seek to inject themselves into this litigation for the purpose of destroying the Court's diversity jurisdiction are not entitled to enforce the same rights.

BPI Technology and Freezing Machines are like the parent corporation in *Elandia* that was "substantially involved in the negotiation and closing of [its subsidiary's] deal," 2010 WL 2179770, at *8—except that these plaintiffs do not even have a parent-subsidiary relationship with the company whose "deals" were allegedly impaired.  Like

the parent company in that case, these companies are "legally stranger[s]" to the business relationships at issue, *id.*, and, therefore, not real parties in interest to the claim of tortious interference.

## CONCLUSION

For the foregoing reasons and the reasons stated in support of the Motion to Dismiss All Claims of Plaintiffs BPI Technology, Inc. and Freezing Machines, Inc. for Fraudulent Joinder and Failure to State a Claim, Plaintiffs' Motion to Remand should be denied, and the Motion to Dismiss should be granted.

Respectfully submitted,

Kevin T. Baine (*pro hac vice*)
Dane H. Butswinkas (*pro hac vice*)
Carl R. Metz (*pro hac vice*)
Stephen J. Fuzesi (*pro hac vice*)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
kbaine@wc.com
dbutswinkas@wc.com
cmetz@wc.com

JOHNSON, HEIDEPRIEM &
   ABDALLAH, LLP

*/s/ Ronald A. Parsons, Jr.*
Scott N. Heidepriem
Ronald A. Parsons, Jr.
Shannon R. Falon
101 South Main Avenue

Suite 100
Sioux Falls, SD 57104
Tel: (605) 338-4304
Fax: (605) 338-4162
scott@jhalawfirm.com
ron@jhalawfirm.com
shannon@jhalawfirm.com


*Attorneys for American Broadcasting Companies,
Inc., ABC News, Inc., Diane Sawyer, Jim Avila, and
David Kerley*

Dated:  December 21, 2012

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

The undersigned hereby certifies that, in accordance with Local Rule 7.1(B), this memorandum contains 11,984 words, inclusive of all footnotes and headings, and exclusive of the cover, table of contents, table of authorities, and counsels' names and addresses.

/s/ Ronald A. Parsons, Jr.
Ronald A. Parsons, Jr.

## <u>CERTIFICATE OF SERVICE</u>

On December 21, 2012, the foregoing ABC DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND, AND REPLY IN SUPPORT OF THEIR MOTION TO DISMISS ALL CLAIMS OF PLAINTIFFS BPI TECHNOLOGY, INC. AND FREEZING MACHINES, INC. FOR FRAUDULENT JOINDER AND FAILURE TO STATE A CLAIM, was filed electronically.  Copies of the foregoing document will be served on all counsel of record by operation of the Court's CM/ECF filing system.

*/s/ Ronald A. Parsons Jr.*
Ronald A. Parsons, Jr.